ESTATE OF ROBERT HARVEY LYONS, DECEASED, THE LONDON & WESTERN TRUSTS COMPANY, LIMITED, AND NETTIE RAY LYONS, AS EXECUTORS, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 2303.  Promulgated April 27, 1945.

*H. B. Jones, Esq.*, and *A. R. Kehoe, Esq.*, for the petitioners.
*B. H. Neblett, Esq.*, for the respondent.

### OPINION.

MELLOTT, *Judge*: The Commissioner determined a deficiency in estate tax in the amount of $43,942.23.  The sole issue is whether the decedent was "a citizen or resident of the United States" at the time of his death. ,

All of the facts are found to be as stipulated.  Summarizing them, decedent, for many years an employee of the DuPont Co., resided in the Dominion of Canada from 1913 until the date of his death on May 31, 1942.  He was born at Union City, Pennsylvania, on May 9, 1879, and was a citizen of the United States.  Entering the employ of the DuPont Co. at Emporium, Pennsylvania, in 1906, he was transferred in 1913 to Vandrenil, P. Q., then to Eli Perot, P. Q., then to Beloeil, P. Q., and finally in 1919 to the Montreal office.  He remained in Montreal until 1921, when he was transferred to the Victoria, B. C., office.  He retired sometime prior to August 1, 1939, and continued to reside in Victoria, B. C.

On August 1, 1939, decedent executed his last will and testament. Therein it is stated that the testator is "of the City of Victoria in the Province of British Columbia, retired."  The parties named in the caption of this case were designated executors and trustees in the will and duly qualified as such.  Nettie Ray Lyons is decedent's widow, entitled to the net income for life from the major portion of his property, and upon her death the property is to be held in trust for decedent's two sons until they become 35 years of age, at which time the property is to be transferred outright to them.  The estate tax return (Form 706) filed by the executors with the collector of internal revenue for the second New York division at New York, New York,

on September 19, 1942, indicates that the decedent and his widow resided at Victoria, B. C., that one son resided at Brownsberg, Que., and that the other was a corporal in the United States Army, at that time in Australia. The sons were 27 and 24 years of age at the time of decedent's death. Citizenship of the decedent at the time of his death was stated in the return to be "American."

The executors, on or about August 11, 1942, filed a Dominion of Canada succession duty return with the Dominion Succession Duties Division, Department of National Revenue, at Vancouver, B. C. Therein the country of domicile of the decedent is stated to be Canada. Attached schedules list Canadian stocks and bonds having an aggregate value of $219,991.21, and succession tax in the amount of $23,029.20 was determined and paid.

Schedules annexed to the Federal (U. S.) estate tax return indicate that the decedent at the time of his death had no real estate, mortgages, notes, cash, insurance, or jointly owned or miscellaneous property in the United States. In an annexed statement forming a part of schedule B are listed various stocks issued by companies incorporated under the laws of states of the United States. The value of these securities is shown to be $31,130.24, but it has been determined by the Commissioner to be $28,417.21.

The following schedule shows the value now agreed upon by the parties for the property owned by the decedent at the time of his death, all of which was "physically located in Canada" at that time, and indicates the portion which petitioners concede is to be included in his gross estate for the purpose of computing the Federal estate tax:

| | | |
|---|---:|---:|
| U. S. stock | | $20,933.75 |
| U. S. bonds | | 4,238.46 |
| Bond payable in U. S. funds | | 3,245.00 |
| Total includible in gross estate (U. S.) | | 28,417.21 |
| Savings account, Victoria, B. C. | $4,695.75 | |
| Cash, Victoria, B. C. | 3,477.27 | |
| Due R. E. contract (Canadian R. E.) | 750.00 | |
| Employees ben. certificate | 1,500.00 | |
| Canadian stock and bonds | 188,860.97 | |
| | | 199,283.99 |
| Total | | 227,701.20 |

The allowable deductions have been agreed upon; so the only question to be determined is whether the $199,283.99 is to be included in gross estate. As indicated at the outset, this depends upon whether decedent was a citizen of the United States at the time of his death. The facts relied upon by petitioners to show that he was not, in addition to those heretofore mentioned, will now be stated.

On March 5, 1940, decedent filed a "Petition for Naturalization" as a Canadian citizen in the County Court of Victoria, B. C., Canada. Under the laws of the Dominion [1] the Secretary of State (referred to as the "Minister") :

* * * may grant a certificate of naturalization to an alien who makes application for the purpose and satisfies the Minister

(a) that he has * * * resided in His Majesty's dominion for a period of not less than five years * * *

(b) that he is of good character * * * [and]

(c) that he intends if his application is granted to * * * reside in His Majesty's dominion * * *

* * * * * * *

(3) The granting of a certificate of naturalization to any such alien shall be in the absolute discretion of the Minister, and he may, with or without assigning any reason, give or withhold the certificate as he thinks most conductive to the public good, and no appeal shall lie from his decision.

(4) A certificate of naturalization shall not take effect until the applicant has taken the oath of allegiance * * *.

(5) A person to whom a certificate of naturalization is granted by the Minister shall * * * be entitled to all political and other rights, powers and privileges, be subject to all obligations, duties and liabilities, to which a natural-born British subject is entitled or subject, and as from the date of his naturalization have to all intents and purposes the status of a natural-born British subject * * *.

Sections 22 to 25, inclusive, of the above act provide for the application by the alien to a judge of a superior or circuit court "for a decision establishing that he is qualified and fit to be naturalized."

(26) If the court decides that the alien is a fit and proper person to be naturalized and possesses the required qualifications a certified copy of such decision shall be transmitted by the clerk of the court to the Minister together with the application and such other papers, documents and reports as may be required by any regulation made hereunder.

(27) The Minister may thereupon in his absolute discretion issue a certificate of naturalization and shall send the same to the clerk of the court to whom the application for naturalization was made. * * * (2) Upon the applicant taking and subscribing the oath of allegiance * * * the clerk shall deliver the certificate to the applicant.

On March 7, 1940, the judge of the County Court of Victoria signed a decision reading as follows :

The applicant [Robert Harvey Lyons] appeared before me in open court on March 5th, 1940, and was examined by me. He has complied with the Naturalization Act and Regulations and is entitled to a certificate of naturalization.

At the outbreak of the present war, pending a decision of the Cabinet on the propriety of granting naturalization in Canada, the Secretary of State of Canada decided to withhold naturalization for some time; but no written order was ever passed suspending naturalization. After a few months it was decided to let naturalization proceed in the or-

[1] Naturalization Act of 1927, ch. 138, Part II.

dinary way and circular letters were sent to the judges and clerks of court advising them to proceed as in the past with naturalization applications and to submit their reports to the Secretary of State, who would consider each application on its merits. "After the short suspension of naturalization at the beginning of the war, the Secretary of State of Canada decided not to deal with applications already received and completed unless the applicants wrote to his department requesting immediate consideration. Mr. Lyons [decedent] did not request immediate action, and for that reason his application and many others remained in abeyance." [2]

Under chapter 3 of the Internal Revenue Code a tax is imposed upon the transfer of the net estate of every decedent, citizen or resident of the United States (sec. 810) and, in determining the value thereof, all property owned by him, wherever situated, is included in gross estate except real property situated outside of the United States (sec. 811). Under Part III of this chapter (secs. 860 *et seq.*) a tax is imposed upon the transfer of the net estate "of every nonresident not a citizen of the United States" which—stated generally—is situated in the United States at the time of his death. This includes stock in domestic corporations (sec. 862). The parties are in agreement as to the portion which is to be included in gross estate in the event decedent is determined to have been a "nonresident not a citizen of the United States" at the time of his death; so we pass at once to consideration of the only question raised : Had the decedent expatriated himself and ceased to be a citizen of the United States prior to his death ?

Under the common law no citizen or subject possessed the power of throwing off his allegiance without the sovereign's consent. That appears to have been the law of the United States at an early date. *Shanks* v. *Dupont*, 3 Pet. (U. S.) 242, 246. Later decisions of the courts of the United States, however, have deviated from the common law rule, and our statutes adopted the view, in 1868, that expatriation was the natural and inherent right of all people. See *Ex parte Griffin* (Dist. Ct. N. Y., 1916), 237 Fed. 445, 449. The Act of July 27, 1868, is shown in the margin.[3]

The statute referred to in the preceding paragraph was a part of the United States Code (8 U. S. C. A. § 15) at the time the decedent

---

[2] The quotation is from the stipulation and is a copy of one paragraph of a letter written by the chief of the Naturalization Branch to attorneys for the petitioner.

[3] Ch. 249, sec. 1, 15 Stat. 223 :

"Whereas the right of expatriation is a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty and the pursuit of happiness ; and whereas in the recognition of this principle this Government has freely received emigrants from all nations, and invested them with the rights of citizenship ; and whereas it is claimed that such American citizens, with their descendants, are subjects of foreign states, owing allegiance to the governments thereof ; and whereas it is necessary to the maintenance of public peace that this claim of foreign allegiance should be promptly and finally disavowed : Therefore any declaration, instruction, opinion, order, or decision of any officer of the United States which denies, restricts, impairs, or questions, the right of expatriation, is declared inconsistent with the fundamental principles of the Republic."

petitioned for Canadian naturalization on March 5, 1940. It was re-enacted as a part of the Nationality Act of 1940 (8 U. S. C. A. § 800).

Statutory provision for loss of nationality by a citizen of the United States was not made until the passage of the Act of March 2, 1907.[4]

The Circuit Court of Appeals for the Ninth Circuit, obviously conscious of the fact that the second paragraph of the act quoted above refers to naturalized citizens while the first paragraph refers to citizens generally, in *Leong Kwai Yin* v. *United States*, 31 Fed. (2d) 738, and *Leong Wah Sut* v. *United States*, 31 Fed. (2d) 740, construed the act as prescribing "the only means by which the expatriation of a native-born American citizen may be accomplished." Petitioners urge that this construction is too narrow, pointing out that other courts have quoted, with apparent approval, statements of textwriters to the effect that actual or express renunciation of one's citizenship is not necessary and that mere absence from his country for a long period, without intention to return, may be sufficient to expatriate a citizen. A careful analysis of decided cases, however, convinces us that, while the rule may be broader than set out in the above quotation, it is not as comprehensive as petitioners urge. Thus, in the case first cited by them and in which the quotation upon which they rely appears, the citizen, while a small child, had returned with his parents to their native land, resided there for 20 years, married, enlisted in its military service, "and after enlistment took the oath of allegiance thereto." *United States ex rel Rojak* v. *Marshall*, 34 Fed. (2d) 219 (C. C. A., 9th Cir., 1929). Summing up the evidence, the court said:

* * * The continued residence of the relator with his family from the time that he arrived at the age of 21 years, in March, 1921, to April, 1925, the military service that he rendered to that country, the statement made by him in procuring his passport, his entry into the United States by way of Canada, and his statement to the immigration authorities of his claim of citizenship in Czecho-Slovakia at the first hearing, justify the conclusion that the relator renounced his citizenship in the United States by becoming a citizen of Czecho-Slovakia.

Under facts somewhat analogous the Circuit Court of Appeals for the Second Circuit, in *United States ex rel Scimeca* v. *Husband*, 6 Fed. (2d) 957, remarked:

* * * Let it be admitted that mere residence in a country other than the United States has no effect upon a citizenship acquired by birth [citing case]; yet whether one who, at the age of 21, had lived for 17 years in Italy with his

---

[4] 34 Stat. 1228, ch. 2534, 8 U. S. C. A. § 17. Section 2 of this statute reads:

"Any American citizen shall be deemed to have expatriated himself when he has been naturalized in any foreign state in conformity with its laws, or when he has taken an oath of allegiance to any foreign state.

"When any naturalized citizen shall have resided for two years in the foreign State from which he came, or for five years in any other foreign State it shall be presumed that he has ceased to be an American citizen * * *. Such presumption may be overcome on the presentation of satisfactory evidence to a diplomatic or consular officer of the United States, under such rules and regulations as the Department of State may prescribe. * * *"

Italian parents, who (as appears in this case) was unable to speak the English language, who served in the Italian army and presumably swore allegiance to the land that claimed his services [citing cases] and who, when he desired to go abroad, took out a passport as an Italian subject bound for Buenos Aires, had not, by this long series of acts, given incontrovertible evidence of an intention to remain an Italian subject, may very well be argued.

*Schaufus* v. *Attorney General of United States*, 45 Fed. Supp. 61 (Dist. Ct. Md.), cited and discussed by both parties upon brief, dealt with one who had been born in Germany of naturalized American parents. When the petitioner in that case was 17 years of age his father became a German citizen and died 21 years later. During petitioner's minority he traveled with his parents to different European countries; but Germany remained his and their domicile. "It was there he received both his general and technical education and was employed. Commencing in 1921, he made repeated efforts to obtain a German passport to come to the United States, but was unsuccessful until 1927. He never made any claim that he was an American citizen, but desired to come to America for the purpose of accepting a position which had been offered him here. Arriving in this country in 1927, petitioner filed, in the same year, a declaration of intention to become an American citizen. But he allowed his rights under this petition to expire after seven years through failure to take the necessary subsequent steps for naturalization. In December, 1934, he left this country as a German subject and spent approximately fifteen days in Germany, returning to the United States in January, 1935, on a re-entry permit. He made no further attempt to become naturalized until January 1939 when he again petitioned to be naturalized." Proceedings under that petition were still pending when, in 1942, following his arrest and detention by the Federal Bureau of Investigation, he instituted suit against the Attorney General for declaratory judgment that he was a citizen of the United States.

The court discussed the recent case of *Perkins* v. *Elg*, 307 U. S. 325, and section 2 of the Act of March 2, 1907, quoted above, and concluded its discussion under the fifth subdivision of its opinion as follows:

As stressed in the *Elg* decision, expatriation is a matter of intent on the part of the person concerned, which must be shown by some express act. In the present case, we believe that the petitioner's entire course of conduct after he attained his majority and continued to reside in Germany, is conclusive evidence of an intent to claim and exercise German citizenship.

In *United States ex rel De Cicco* v. *Longo*, 46 Fed. Supp. 170 (Dist. Ct. Conn.), a native of Italy, naturalized in the United States in 1909, returned to Italy in 1915 and voluntarily reentered its military service at a rank he had formerly held. After several months in the service he was sent to London with an Italian military commission and later to the United States with an Italian Government mission. He reentered the United States on an Italian diplomatic passport. He

served with the Italian commission in Washington until 1919, when he moved with his family to New Haven and assumed the office of Italian consular agent, to which he had been appointed prior to his departure for Italy in 1915. He returned to Italy in 1919 and came back to the United States in 1920. His certificate of admission showed that he was admitted as a citizen of Italy whose last permanent residence was New Haven, Connecticut. He had been a member of the National Fascist Party of Italy since 1925 and received two fascist citations from the Italian Government as a result of injuries received when attacked in this country by anti-fascists. The court held that his reentry into Italian military service in 1915, under the Italian law then in effect, repatriated him as an Italian citizen and that his acceptance of employment by the state with the missions to London and Washington would have had that effect even if the entry into the army had not taken place. It also held that, whether an oath of allegiance had been taken in 1915 or not, his voluntary submission to military service, required of him under the oath taken in 1900 when he had previously been in the military service, must be considered as, in effect, the taking of an oath of allegiance in 1915 within the meaning of the act of 1907. Conclusion was therefore reached that the American citizenship had been lost. Cf. *Ex parte Griffin*, *supra*.

This tribunal recognized and applied the same principle in *St. Louis Union Trust Co.*, 27 B. T. A. 318. The decedent in that case, a natural-born citizen of the United States, resided in Kenya Colony in British East Africa from 1903 until his death in 1925. He served in the British Army throughout the first world war, retiring with the rank of major. Subsequently he was knighted by the British Crown. Still later he was elected a member of the legislative council which governed Kenya Colony and remained a member of that body until his death. To qualify for such membership he took the oath of allegiance to the British Crown. It was held that he had expatriated himself and was not a citizen of the United States at the time of his death.

No decided case has been cited or found in which it has been held that mere protracted residence in a foreign state by a national of the United States and the filing of a declaration of intention to become a citizen of the foreign state deprived him of his citizenship in the United States. The authorities all seem to recognize that there must be a "voluntary renunciation or abandonment of nationality and allegiance." (*Perkins* v. *Elg*, *supra*.) Just how this could be accomplished was, perhaps, enshrouded in some uncertainty prior to the enactment of the Nationality Act of 1940.[5] This act was the culmination of several years of work by legislative committees, which "had the benefit of the most expert talent of the Department of State, * * *

---

[5] Title 8, U. S. C. A., sec. 801 *et seq.*

and of the Department of Justice." [6]   The subcommittee had before it "able representatives of the American Bar Association and other associations of Attorneys," as well as representatives of civic organizations, and the bill "had the endorsement of the War Department and the American Bar Association." [6]   Few bills "have received more careful consideration and painstaking preparation." [6]

It is, of course, true, as petitioners point out upon brief, that the Nationality Act of 1940 has no retroactive applicability and hence is not determinative of decedent's status on March 7, 1940, when the judge signed his decision and transmitted the papers to the Minister. The legislative history indicates, however, that Congress was endeavoring to incorporate, in the statutory law of the land, the principles which had been enunciated by the courts and which sound judgment dictated.   Thus it was provided that loss of nationality would result by: (a) Obtaining naturalization in a foreign state; (b) taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state; (c) entering, or serving in, the armed forces of a foreign state unless expressly authorized by the laws of the United States, if citizenship in the foreign state is thereby acquired; (d) accepting an office or employment under the government of a foreign state or political subdivision thereof for which only nationals of such state are eligible; (e) voting in a political election in a foreign state; (f) making a formal renunciation of nationality before a diplomatic or consular officer of the United States in a foreign state; (g) deserting the military or naval service in time of war, provided he is convicted thereof by a court martial; and (h) committing treason against the United States, provided he is convicted thereof by a court martial or a court of competent jurisdiction.   The failure to incorporate in this act a provision that loss of citizenship would occur as the result of filing a declaration of intention to become a citizen of another state if preceded by residence therein for a specified period of time is a strong circumstance indicating that such a provision would be unwise and was not, at that time, thought to be a well established principle, if, indeed, it had ever been applied by any court.

The laws of most states prescribe that some time shall elapse between the filing of a declaration of intention and the taking of a formal oath of allegiance.   Canada is no exception, its law providing that the application "shall be posted   *   *   *   in a conspicuous place in   *   *   *   [the office of the clerk of court] continuously for a period of at least three months before the application is heard by the court."   It would be extremely unfortunate in many cases if, during that period, the declarant were in the position of being a

---

[6] Congressional Record—House, Sept. 11, 1940, p. 11944 *et seq.*

citizen of no country—a mere citizen of the world. Moreover judicial notice may be taken of the fact that thousands who have filed declarations of intention have, for reasons deemed sufficient to them, changed their minds and retained citizenship in the state of their nativity. Whether this decedent might have done so need not be determined or even speculated upon. Clearly, he could have refrained from taking the oath of allegiance to the British Crown even if the Minister had transmitted his certificate of naturalization to the clerk of the court with instructions to deliver it to him upon his taking and subscribing to the oath.

Our best judgment is that the decedent was a citizen of the United States at the time of his death, and it is so held. The parties stipulated that, if this should be our holding, decision should be deferred until appropriate and final action is taken upon a convention signed by representatives of Canada and the United States at Ottawa on June 8, 1944, for the avoidance of double taxation and the prevention of fiscal evasion in the case of estate taxes and succession duties on property belonging to a national of either country. Exchange of instruments of ratification was made on February 6, 1945, and proclaimed by the President on March 6, 1945. The convention, by its terms, is effective from and after June 14, 1941. Decedent having died subsequent to that date, Federal estate tax upon his estate shall be computed in the manner specified in the convention and

*Decision will be entered under Rule 50.*