*An appropriate order will be entered.*

ESTATE OF EFTHIMIOS D. VRINIOTIS, DECEASED, ATLANTIC BANK OF NEW YORK, ANCILLARY ADMINISTRATOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11353–78.     Filed August 11, 1982.

*Isidore R. Tucker*, for the petitioner.
*Guy G. Lavignera*, for the respondent.

PARKER, *Judge*: Respondent determined a deficiency in petitioner's Federal estate tax of $10,035.95 and an addition to the tax under section 6651(a)(1)[1] of $2,508.99. The issues for decision are:

(1) Whether decedent was a citizen of the United States at the time of his death so that his estate is liable for U.S. estate tax;

(2) Whether the Estate Tax Treaty with Greece exempts from U.S. estate tax the estate of a decedent who, at the time

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect on May 6, 1974, the date of the decedent's death.

of his death, was domiciled in Greece and had dual U.S. and Greek citizenship; and

(3) Whether there was reasonable cause for the late filing of the estate tax return.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

Efthimios D. Vriniotis (hereinafter decedent) died in Greece on May 6, 1974. The Atlantic Bank of New York was ultimately appointed as the ancillary administrator of his estate. At the time the petition in this case was filed, the principal place of business of the Atlantic Bank of New York was located in New York, N.Y.

Decedent was born on April 15, 1896, in Skourohorion, Pyrgou-Elias, Greece. As a child of Greek citizen parents, decedent was a Greek citizen by birth. Decedent lived in Greece up until 1926.

Sometime during 1926, decedent emigrated from Greece and came to the United States. Decedent lived in the United States continuously from 1926 until June of 1973. Throughout that period, decedent lived alone in a rented apartment or room in Brooklyn, N.Y. On November 11, 1954, decedent was naturalized as a citizen of the United States. During most of the time he lived in the United States, decedent owned and operated a luncheonette or restaurant business in Brooklyn. Sometime in 1970, decedent sold his restaurant business and retired. From that time until June of 1973, decedent lived in a rented room and visited frequently with relatives in the United States, including his niece, Tasia Ntavos.

While his niece was vacationing in New York in 1970, decedent told her that he wanted to return to Greece to live permanently. When he learned in 1972 that the Ntavos family was planning a vacation trip to Greece in June of 1973, decedent asked to travel with them. To prepare for his trip, decedent in 1973 obtained an American passport and purchased a one-way plane ticket to Greece. Decedent also purchased and shipped to Greece luggage, new clothes, and many gifts for members of his family and his friends in Greece. Sometime in June of 1973, decedent flew to Athens, Greece,

and then took a train to the village of Skourohorion in Pyrgou-Elias, where he was born. The Ntavos family stayed in Greece about 6 weeks and then returned to the United States. Petitioner remained in Greece.

From the time he arrived in Greece until the time he died on May 6, 1974, decedent lived with one of his two sisters in the house where he was born. The house was owned by decedent and his brother, George, who died a few months before decedent, on January 16, 1974. Throughout this period, decedent neither voted nor registered to vote in any elections in Greece. No elections were held during that period because a dictatorship was then ruling Greece. During his time in Greece, decedent socialized with his family and villagers, worked on his house, and actively participated in the local church. Decedent also started to negotiate for a lot and home located on the seashore. Before the negotiations were completed, however, decedent died of heart failure on May 6, 1974.

Although decedent told relatives that he intended to remain in Greece permanently, he never stated that he intended to renounce his U.S. citizenship, and he never took any action to renounce his U.S. citizenship. On the date of decedent's death, the registrar of Skourohorion issued a "Death Registration Act" (death certificate) for decedent describing him as an American citizen. On March 12, 1975, the U.S. Foreign Service issued a "Report of the Death of an American Citizen" for decedent. That report stated that decedent's American passport had been canceled and destroyed, but that his naturalization certificate had not been surrendered.

At the time of his death, decedent owned real property in Greece consisting of two houses and eight tracts of land. The Greek taxing authorities appraised the value of that real property at $27,580.80 in U.S. dollars[2] and imposed an inheritance tax thereon.[3] Decedent also owned a one-third interest in the estate of his brother, George, valued at

---

[2]The dollar value was determined by converting the amount of 816,000 Greek drachmas, as reported to the Greek tax collector's office, to U.S. currency at the exchange rate of 0.0338 drachmas to 1 U.S. dollar, the rate in effect on the date of decedent's death.

[3]The parties have stipulated that in the event decedent's estate is held to be liable for U.S. estate tax, the estate is entitled to a credit in the amount of $438.05 for Greek inheritance tax paid on the real property.

$2,848.24. In addition, decedent owned six savings accounts in the United States that were spread among four New York banks. The total amount on deposit in those accounts at the time of decedent's death was $100,806.98. The Greek taxing authorities did not impose an inheritance tax on either decedent's interest in his brother's estate or his American bank accounts.

Decedent, an unmarried person, died intestate. He was survived by his two sisters who lived in Greece, Fani D. Gali and Paraskevi S. Saltamavrou. Shortly after decedent's death, the sisters hired Spyridon Th. Foteinou, an attorney in Athens, Greece, to represent the estate and to obtain the release of decedent's funds on deposit in the New York banks. In this connection, Foteinou made an inquiry through the offices of the consulate general of Greece at New York City in early June of 1974. Around June 15, 1974, Foteinou's inquiry was referred to Nicholas J. Stevason, an American attorney experienced in estate matters, particularly in New York. Stevason could read, write, and speak Greek to some extent and had represented both the Greek Government in New York and the trust department of the Atlantic Bank of New York.

Stevason promptly responded to Foteinou's inquiry and advised the sisters, either directly or through Foteinou, that in order to obtain decedent's New York funds, they first had to obtain a certificate of inheritance from the Greek courts before the New York courts would appoint the Atlantic Bank of New York as ancillary administrator, thus allowing it to administer the funds. As the estate's attorney in the United States, Stevason continued to correspond with Foteinou regarding decedent's estate from late June of 1974 until near the end of January of 1975.

Pursuant to Stevason's advice, decedent's sisters executed a power of attorney on April 2, 1975, authorizing the Atlantic Bank of New York to represent them in the United States. Sometime later, during April or May of 1975, decedent's sisters further followed Stevason's suggestions by filing an application with the court of first instance for the prefecture of Elias, Greece, for a certificate of inheritance pursuant to the Greek civil code. The Greek court held a hearing on the matter on June 4, 1975, and the next day issued an order and judgment, naming the sisters as decedent's sole intestate heirs.

About a month later, on July 8, 1975, the secretary of the court of first instance issued the formal certificate of inheritance to the sisters.

By October of 1975, Stevason had drafted a petition for ancillary letters of administration on behalf of the Atlantic Bank of New York. The petition was then executed by a trust officer of the bank and filed in the Surrogate's Court of the County of New York on December 11, 1975. The following documents were attached to and filed with the petition: The power of attorney executed April 2, 1975, by decedent's sisters in favor of the bank; copies of the court of first instance's order and judgment, and the formal certificate of inheritance; certificates of the authenticity and conformity with Greek law of such documents; a copy of decedent's death registration act (death certificate); and an affidavit on Greek law concerning the administration of estates. The Surrogate's Court promptly issued ancillary letters to the bank on December 15, 1975.

The U.S. estate tax return was due 9 months after the date of decedent's death, or February 6, 1975. See sec. 6075(a). Nevertheless, Stevason did not finish preparing the return until sometime in January of 1976 and he did not file it until February 25, 1976, over a year late.

On the estate tax return, as filed, Stevason listed decedent's American bank accounts and his interest in his brother's estate as assets but did not list his real property in Greece. The return reported a total gross estate of "None" and a net estate tax payable of "None," with the following explanation:

Decedent left the United States * * * and has since been domiciled in Greece. He has maintained neither a residence nor any other home, permanent or temporary, in the United States. Decedent was a native citizen of Greece and after residing in the U.S.A. he applied for and became a U.S. citizen. However, he returned to Greece as stated above, and was domiciled in Greece until his death. Under the Estate Tax Treaty with Greece, Artice (sic) IV, (2)(j) the situs of bank deposits and claims of any other nature shall be deemed to be situated in the State (country) in which the deceased person was domiciled at the time of his death, namely, Greece. Decedent was a citizen of Greece, having re-adopted his Greek citizenship when he returned to live in Greece where he lived * * * until his death. Therefore, the above [bank] accounts are not includible or taxable in the estate. See Schedule F, item i [interest in brother's estate] which is also not taxable.

On October 15, 1976, about 8 months after the U.S. estate tax return was filed, the Surrogate's Court entered an order

exempting decedent's estate from New York State estate tax on the ground that decedent was not domiciled in New York at the time of his death. In those proceedings, however, the Surrogate's Court did not determine whether or not decedent was a citizen of the United States at the time of his death.

In his statutory notice dated September 13, 1978, respondent determined that decedent's entire estate, including his real property in Greece, his American bank accounts, and his interest in his brother's estate, was liable for U.S. estate tax. Respondent gave the following general explanation for his determination:

It is determined that as of the date of death decedent was a United States citizen domiciled in Greece. Taxable estate is therefore computed in accordance with Subchapter A, Chapter 11 of Subtitle B of the Internal Revenue Code, 1954 edition, as amended, and provisions of the United States-Greece Estate Tax Treaty.

## OPINION

The ultimate question for decision is whether decedent's estate is liable for U.S. estate tax. Petitioner contends that decedent was domiciled in Greece and was a citizen of both Greece and the United States at the time of his death. Focusing on decedent's Greek domicile and Greek citizenship, petitioner argues that the Estate Tax Treaty between the United States and Greece exempts such a decedent's estate from U.S. estate tax.

Respondent argues that decedent was a citizen of the United States at the time of his death and that his estate therefore is liable for U.S. estate tax. Respondent further argues that the estate tax treaty does not alter the estate's liability for Federal estate tax since the treaty's only purpose is to prevent double taxation of a decedent's movable assets by providing credits for any foreign taxes paid. We agree with respondent.

Subchapter A, chapter 11 of subtitle B of the Internal Revenue Code covers the estates of citizens or residents of the United States. Section 2001 imposes a tax on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States at the time of his death. Section 2051 defines a decedent's taxable estate as the value of the gross estate less an exemption ($60,000 in 1974) and certain deductions. Section 2031(a) defines a decedent's gross estate as the value at the time of his death of "all property, real or personal,

tangible or intangible, *wherever situated.*" (Emphasis added.) Section 2014(a) provides a credit for foreign death taxes paid in respect of any property situated within the foreign country and included in the gross estate.

Given this statutory framework and the fact that the estate tax treaty does not determine citizenship or nationality, we must first decide whether decedent was a citizen of the United States at the time of his death so as to bring his estate within the ambit of those estate tax provisions.

Although the term "citizen" is not defined in the estate tax statutes or regulations, it is defined in section 1.1–1(c), Income Tax Regs., as follows:

(c) *Who is a citizen?* Every person born or naturalized in the United States and subject to its jurisdiction is a citizen. For other rules governing the acquisition of citizenship, see chapters 1 and 2 of title III of the Immigration and Nationality Act (8 U.S.C. 1401–1459). For rules governing loss of citizenship, see sections 349 to 357, inclusive, of such Act (8 U.S.C. 1481–1489), *Schneider v. Rusk,* (1964) 377 U.S. 163, and Rev. Rul. 70–506, C.B. 1970–2, 1 * * *

The courts have consistently held that U.S. citizenship implies not only rights but also duties, one of which duties is the payment of taxes. *United States v. Rexach,* 558 F.2d 37, 42 (1st Cir. 1977); *United States v. Matheson,* 532 F.2d 809, 819 (2d Cir. 1976), cert. denied 429 U.S. 823 (1976); *Rexach v. United States,* 390 F.2d 631, 632 (1st Cir. 1968), cert. denied 393 U.S. 833 (1968). In *Cook v. Tait,* 265 U.S. 47 (1924), the Supreme Court held that a U.S. citizen domiciled in Mexico with no assets or income from sources within the United States nevertheless was liable for U.S. income tax. The Court reasoned that since the United States Government benefits its citizens and their property wherever found, its power to tax them is based on their relation to it as citizens and not on their domicile or on the situs of their property. 265 U.S. at 56.

It is well settled that an American citizen loses his citizenship only if he voluntarily renounces it and performs one of the acts of expatriation listed in section 349 of the Immigration and Nationality Act, 8 U.S.C. sec. 1481 (1977).[4] *Afroyim v.*

---

[4]At the time of decedent's death, sec. 1481 of tit. 8, U.S.C., listed 10 acts by which an American citizen would lose his nationality: (1) Obtaining naturalization in a foreign State upon his own application; (2) taking an oath or declaring allegiance to a foreign State; (3)

*Rusk,* 387 U.S. 253, 262 (1967); *United States v. Rexach, supra* at 43; *United States v. Matheson, supra* at 814–815; *Estate of Lyons v. Commissioner,* 4 T.C. 1202, 1208–1209 (1945). Living abroad for a long or indefinite period of time does not by itself constitute a renunciation of U.S. citizenship. *Schneider v. Rusk,* 377 U.S. 163, 168 (1964); *Estate of Lyons v. Commissioner, supra* at 1208.[5] Furthermore, an American citizen may be simultaneously a citizen of another country without losing his U.S. citizenship and without precluding the United States from taxing him. *United States v. Matheson, supra* at 816–817; *Jalbuena v. Dulles,* 254 F.2d 379, 381 (3d Cir. 1958); *Rueff v. Brownell,* 116 F. Supp. 298, 306 (D. N.J. 1953).

In the present case, decedent was born a citizen of Greece and later naturalized as a citizen of the United States. Decedent's subsequent naturalization as an American citizen did not automatically deprive him of his Greek citizenship, and we assume that he had dual citizenship.[6] Decedent never renounced his American citizenship and never performed any act of expatriation under section 349 of the Immigration and Nationality Act. Neither did decedent's return to Greece in order to live out his days constitute a renunciation of his

---

entering or serving in the armed services of a foreign State without prior permission; (4) working in an office under a foreign government where nationality also is acquired or where a declaration of allegiance is required; (5) voting in a foreign political election; (6) making a formal renunciation of nationality before a diplomatic or consular officer of the United States in a foreign State; (7) making a formal written renunciation of nationality in the United States whenever it is in a state of war and the Attorney General approves the renunciation as not contrary to the interests of national defense; (8) deserting the military of the United States in time of war when convicted thereof by court martial and dismissed or dishonorably discharged from the military service; (9) committing any act of treason against, or attempting by force to overthrow, or bearing arms against, the United States; and (10) departing from or remaining outside of the United States in time of war or during a period of national emergency for the purpose of evading or avoiding training and service in the military of the United States.

[5]Respondent has taken the same position in Rev. Rul. 75–82, 1975–1 C.B. 5.

[6]The United States clearly recognizes dual citizenship. See *United States v. Matheson,* 532 F.2d 809, 816–817 (2d Cir. 1976), cert. denied 429 U.S. 823 (1976); *Jalbuena v. Dulles,* 254 F.2d 379, 381 (3d Cir. 1958); *Rueff v. Brownell,* 116 F. Supp. 298, 306 (D. N.J. 1953).

Art. 31 of the Greek civil code also gives full recognition to dual citizenship. Where a Greek citizen is later naturalized as a citizen in a foreign country, he will not thereby lose his Greek citizenship unless he (1) voluntarily renounces it and (2) applies for and receives approval of that renunciation from certain Greek officials. See art. 15, par. 2 of the Greek civil code and art. 14, pars. 1 through 3 of the Greek code of citizenship.

The record in this case does not show whether decedent ever renounced his Greek citizenship. However, it is not necessary to decide this for purposes of the result in this case, and we have assumed for purposes of our holding that decedent had dual U.S.-Greek citizenship.

American citizenship. Regardless of conversations with his friends and relatives about remaining in Greece permanently, decedent could always have changed his mind and returned to the United States. Death certificates issued by the Governments of both Greece and the United States described decedent as an American citizen and indicated that his naturalization certificate had not been surrendered. Thus, based on the facts of this case and the applicable law discussed above, we hold that decedent died a citizen of the United States.

Since decedent died an American citizen, his estate is liable for U.S. estate tax under section 2001 of the Internal Revenue Code. Sometimes, treaties between the United States and foreign countries can alter this tax liability under the Internal Revenue Code. See article 6, clause 2 of the U.S. Constitution, which states that treaties are the "supreme Law of the Land"; section 7852(d), which states that no provision of the Internal Revenue Code shall apply in any case where its application would be contrary to any treaty obligation of the United States in effect on the date of the Code's enactment; section 20.0–1(a)(1), Estate Tax Regs., which states that the application of many of the provisions of the estate tax regulations may be affected by the terms of an applicable death tax convention with a foreign country.

The Estate Tax Treaty with Greece[7] was executed for the purpose of avoiding double taxation and preventing fiscal evasion with respect to taxes on the movable property estates of deceased persons. Article I of the treaty lists the taxes covered as the U.S. estate tax and the Greek tax on inheritances.

Article III of the treaty originally provided that immovable property (real property) situated in Greece was exempt from U.S. estate tax and that immovable property situated in the United States was exempt from Greek inheritance tax. Article

---

[7]The Estate Tax Treaty, originally entitled the "Convention between the United States of America and the Kingdom of Greece for the avoidance of double taxation and the prevention of fiscal evasion with respect to taxes on the estates of deceased persons," was originally signed on Feb. 20, 1950, and was ratified by the two Governments in 1951 and 1953. The treaty became effective for the estates or inheritances of persons dying on or after Dec. 30, 1953. 5 U.S.T. (Part 1) 12, T.I.A.S. 2901, 1957–1 C.B. 645–649. After a supplementary protocol to the treaty in 1964, as discussed in note 8 below, the title of the treaty was changed to read "with respect to the movable property estates of deceased persons."

III thus mirrored the U.S. estate tax law in force at the time the treaty went into effect. Later, when the U.S. estate tax law in regard to real property was changed, the treaty was changed to delete article III and thus bring the treaty into conformity with U.S. estate tax laws.[8] Therefore, at the time of decedent's death, the treaty covered only movable property.

Article IV of the treaty expressly provides that the treaty does not apply to immovable property situated in either country, but that it does apply to movable property of a decedent domiciled in either Greece or the United States at the time of death. Article IV further provides rules for determining the situs of the movable assets of a person domiciled in one of the two countries for purposes of imposition of the tax and the credit provided for in article VI.[9]

Article VI contains a system of credits which is the treaty's principal method for avoiding double taxation of estates. Where a decedent dies a citizen of the country imposing the tax, article VI(1) provides that:

---

[8]Prior to 1962, sec. 2031(a) excluded from a decedent's gross estate real property situated outside of the United States. Because of this exclusion, decedents who died American citizens were accordingly not allowed a credit for any estate or inheritance taxes imposed by a foreign country on such property. Sec. 18(a)(1) of the Revenue Act of 1962, Pub. L. 87–834, 76 Stat. 960, 1052–1053, changed sec. 2031(a) by making real property situated outside of the United States includable in the gross estate. Consistent with this change, a credit was allowed for taxes imposed on such property by the country in which it was situated. Sec. 31 of that act, 76 Stat. 1060, further provided that sec. 7852(d) did not apply to any amendments made therein and that any such changes would take precedence over prior treaty obligations.

On Feb. 12, 1964, the United States and Greece executed a supplementary protocol to the treaty that expressly made it inapplicable to immovable property in order to bring it into conformity with changes made in the U.S. estate tax law by the Revenue Act of 1962.

Effective on Oct. 27, 1967, the Estate Tax Treaty was modified so that it was no longer applicable to immovable property. See Report of the State Department, Mar. 2, 1964, CCH Tax Treaties par. 3174 (1964); Report of the Senate Foreign Relations Comm., June 1, 1964, CCH Tax Treaties par. 3175 (1964); Report of the State Department, Apr. 14, 1950, CCH Tax Treaties par. 3176 (1964).

[9]Art. IV provides in pertinent part as follows:

"(1) For the purposes of the present Convention, the question whether a decedent was domiciled in the territory of one of the Contracting States at the time of his death shall be determined in conformity with the laws in force in that territory.

"(2) In the case of a person domiciled in the territory of one of the Contracting States, the situs of any of the following property or property rights shall, for the purpose of the imposition of the tax and for the purpose of the credit provided for in Article VI, be determined exclusively in accordance with the following rules * * *"

Subpar. (a) of par. 2 provides that the treaty is not applicable to immovable property situated in either country. Subpars. (b) through (j) provide rules for determining the situs of different types of movable property.

(1) The Contracting State imposing tax in the case of a deceased person who, at the time of his death, was domiciled in such State or was a citizen or subject thereof, shall allow against its tax a credit for the amount of the tax imposed by the other Contracting State with respect to property situated in the territory of such other Contracting State and included for tax purposes by both States, but the amount of credit shall not exceed the portion of the tax imposed by the former State which is attributable to such property * * *

Except for providing credits under article VI for taxes imposed by Greece on a decedent's movable assets, the treaty does not affect the application of the Federal estate tax to the estate of a decedent who dies a citizen of the United States.[10] In other words, the U.S. estate tax applies to the entire estate of a U.S. citizen regardless of where he is domiciled or regardless of where his property is situated, and the treaty does not change those basic rules. Report of the Senate Foreign Relations Comm., Aug. 6, 1951, CCH Tax Treaties par. 3177 (1968).

It is not clear whether or not petitioner argues that the treaty exempts decedent's real property in Greece from U.S. estate tax. However, as discussed above, the treaty does not apply to real property at all. See note 8. Article IV(2)(a)[11] of the treaty expressly states that the treaty does not apply to immovable property situated in either Greece or the United States. The situs of real property is, of course, the country where the land is located. Thus, land located in Greece and owned by a decedent who was domiciled in Greece at the time of his death can be and here was taxed by the Greek Government. However, the entire estate of a citizen of the United States is taxed on the basis of the decedent's citizenship and not on the basis of the situs of his property. Nothing in article IV of the treaty changes that fact. Section 2031(a) of the Internal Revenue Code provides that decedent's real property "wherever situated" is includable in his gross estate.

---

[10]See Report of State Department from Secretary of State Dean Acheson to the President of the United States, Apr. 14, 1950, CCH Tax Treaties par. 3176 (1964). See also Report of the Senate Foreign Relations Comm. on Certain Estate Tax Conventions, Aug. 6, 1951, CCH Tax Treaties par. 3177 (1968).

[11]Art. IV(2)(a) provides that:

"The provisions of the present Convention shall be deemed as not applicable to immovable property situated in either the United States or Greece. Immovable property shall be deemed to be situated at the place where the land involved is located. The question whether any property or right in property constitutes immovable property shall be determined in accordance with the law of the place where the land involved is located."

Therefore, we hold that the estate is liable for U.S. estate tax on decedent's real property in Greece. However, the estate is entitled to a credit under section 2014(a) in the amount of $438.05 for Greek inheritance tax paid on that property. This credit arises under the U.S. estate tax laws and not under the treaty.

Petitioner argues that article IV(2)(j) and V(b) of the treaty make decedent's movable property exempt from U.S. estate tax and taxable only by Greece. Again, petitioner fails to recognize that, apart from possible credits, the treaty does not affect the application of the Federal estate tax to the estate of a decedent who died a citizen of the United States. While article IV(2)(j) determines the situs of certain movable assets, the estate of a U.S. citizen is taxed on the basis of citizenship and not on the situs of his property. Since decedent was domiciled in Greece, the situs of his bank deposits was Greece and those deposits thus could have been taxed by Greece. Any such tax would trigger article VI(1) and require a credit if both countries included the property for tax purposes. However, the record does not show that Greece has imposed any tax on the bank deposits or on decedent's interest in his brother's estate. Since no tax has been imposed by or paid to Greece with respect to decedent's movable property, no credit is allowable under article VI(1) with respect to such property.

Petitioner's reliance on article IV(2)(j)[12] is thus misplaced. That article merely provides that the situs of decedent's interest in his brother's estate and his American bank accounts is deemed to be in Greece. Article IV provides situs rules where the country is imposing tax based upon the decedent's domicile within that country. That article does not bar the United States from taxing decedent's assets, because section 2031(a) defines decedent's gross estate as "all property, real or personal, tangible or intangible, *wherever situated.*" (Emphasis added.) Therefore, even though decedent's movable property is deemed to be situated in Greece, it is includable in his gross estate and liable for U.S. estate tax.

---

[12]Art. IV(2)(j) provides that:

"Bonds, bank deposits, and claims of any other nature, secured or unsecured, and other property not otherwise mentioned hereinbefore, shall be deemed to be situated in the State in which the deceased person was domiciled at the time of his death."

Neither does article V(b)[13] exempt decedent's movable property from U.S. estate tax. That article applies only to a decedent who, at the time of his death, was neither a citizen nor a domiciliary of the country which imposes the tax but was a citizen or domiciliary of the other country. In other words, article V(b) applies to the estates of nonresident aliens. Since decedent was an American citizen at the time of his death, article V(b) does not apply to alter his estate's liability for U.S. estate tax.

The second question for decision is whether there was reasonable cause for the late filing of the estate tax return. Section 6075(a) states that an estate tax return shall be filed within 9 months of the date of the decedent's death. Section 6651(a)(1) imposes an addition to tax where the taxpayer's return is filed after the prescribed due date unless the delay is due to reasonable cause and not due to willful neglect. Section 301.6651–1(c)(1), Proced. & Admin. Regs., provides that reasonable cause exists where the taxpayer exercises ordinary business care and prudence and is still unable to file the return within the statutory time period.

Petitioner's return was due on February 6, 1975. The return was not filed until February 25, 1976, more than a year late. Petitioner offers several explanations as to why it was unable to file the return on time. However, after reviewing the record, we do not find any of these explanations persuasive.

Petitioner argues that the late filing primarily was due to several events occurring after decedent's death. Petitioner first contends that there was no one authorized to file the return by the due date since the bank was not appointed as administrator until December 15, 1975. Petitioner further asserts that Stevason, counsel for the estate, could not have prevented the late filing even though he was first contacted about the estate by June 15, 1974. In support, petitioner points

---

[13]Art. V(b) provides that:

"The Contracting State which imposes tax in the case of a decedent who, at the time of his death, was not a citizen or subject of such Contracting State and was not domiciled in its territory, but was a citizen or subject of the other Contracting State or was domiciled in the territory of such other Contracting State:"

\* \* \* \* \* \* \*

"(b) shall \* \* \* take no account of property situated according to Article IV outside its territory in determining the amount or rate of tax."

out that between this contact and the filing of the return, Stevason had to (1) wait for a certificate of inheritance to be issued by the Greek courts; (2) prepare and file a petition and numerous documents for the bank's appointment as administrator; and (3) wait for English translations of full descriptions of decedent's real property in Greece.

Although the formal issuance of ancillary letters was required before the bank could administer decedent's American bank accounts, it was not necessary in order for Stevason to file a Federal estate tax return. Stevason was first contacted regarding the estate and the bank's appointment as administrator almost 8 months before the return was due. Throughout this period and until the bank's appointment as administrator, Stevason served as petitioner's attorney in the United States. Since Stevason was the only person then in a position to know of the U.S. estate tax requirements, he was responsible for timely filing the return or for contacting a competent tax adviser to determine whether a return was required. We think that 8 months was an ample period for Stevason either to contact a tax adviser or to ascertain decedent's assets and to prepare and file the return. Nevertheless, Stevason did not proceed with filing a return until well after the bank was appointed administrator.

Furthermore, any difficulties that Stevason may have encountered in obtaining descriptions of decedent's real property in Greece were minimal and clearly did not cause the late filing since the return did not list any such property. Even if these problems had contributed to the delay, they would not constitute reasonable cause, for Stevason was required to file petitioner's return based on the best information available and then file a later amended return if necessary. See *Beck Chemical Equip. Corp. v. Commissioner*, 27 T.C. 840, 859–860 (1957).[14]

In any event, we are not persuaded that the late filing actually was due to Stevason's decision to wait for the Greek court's certificate of inheritance, the bank's appointment as administrator, or the descriptions of decedent's real property in Greece. We think the main reason that Stevason did not

---

[14]See also *Estate of Sikler v. Commissioner*, T.C. Memo. 1981–587; *Long v. Commissioner*, T.C. Memo. 1978–171.

timely file the return was his mistaken belief that the estate was not liable for U.S. estate tax. When he finally filed the return, Stevason reported a gross estate and net estate tax payable of zero. On Schedule C of the return, he explained that decedent's assets were not includable or taxable in the estate because decedent was not domiciled in the United States at the time of his death. Stevason gave a similar explanation at the trial:

I felt at the time I was just going through a pro forma matter because in my judgment, the deceased was a non-domiciliary who was domiciled in Greece like many other estates that I've handled. And that it would be exempted from the federal estate tax by virtue of his domicile.

Stevason's mistaken belief regarding the taxability of the estate does not constitute reasonable cause for the late filing of the return. Although Stevason was experienced in estate matters, particularly in the State of New York, there is no evidence that he was a competent U.S. tax adviser. Furthermore, there is no indication that Stevason ever inquired into decedent's status as an American citizen. Under the circumstances, petitioner's reliance on Stevason to determine whether a return was required did not constitute reasonable cause.[15]

On this record, we cannot find that petitioner exercised ordinary business care and prudence and was nevertheless unable to file the return within the prescribed time. Accordingly, we hold that petitioner has not established reasonable cause for the late filing and that the addition to tax under section 6651(a)(1) is sustained.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[15]See *Estate of Goff v. Commissioner*, T.C. Memo. 1978–36; *Robinson v. Commissioner*, T.C. Memo. 1957–8.