ATEF A. AND DEE H. GAMAL-EDLIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
GAMAL-EDLIN v. COMMISSIONER
Docket No. 44442-86.
United States Tax Court
T.C. Memo 1988-150; 1988 Tax Ct. Memo LEXIS 178; 55 T.C.M. (CCH) 582; April 12, 1988. Atef A. Gamal-Edlin, pro se. Michael A. Urban, for the respondent. GUSSIS
MEMORANDUM FINDINGS OF FACT AND OPINION GUSSIS, Special Trial Judge: This *180 case was heard pursuant to the provisions of section 7443A(b)(3) of the Internal Revenue Code and Rule 180 et seq. [1]
Respondent determined a deficiency in petitioners' Federal income tax for 1984 in the amount of $ 4,271.40. The issue in this case is whether petitioner Atef A. Gamal-Edlin is liable for the self-employment tax imposed by section 1401(a). Some of the facts were stipulated and they are so found. For convenience and clarity we have combined our findings of fact and opinion. Atef A. and Dee H. Gamal-Edlin resided in Cairo, Egypt when they filed their petition with this Court. They filed a joint Federal income tax return for the taxable year 1984 with the office of the Internal Revenue Service at Philadelphia, Pennsylvania. At all relevant times Atef A. Gamal-Edlin (hereinafter referred to as petitioner in the singular) was both a citizen and resident of Egypt and a citizen [2] of the United States. During 1984 petitioner *181 received a lump-sum payment of $ 52,300 from the Egyptian law partnership of Gamal-Edlin, Khalil, Abu Bakr & Associates (hereinafter referred to as the firm). Petitioner reported that amount on his 1984 Federal income tax return, Form 2555 entitled "Foreign Earned Income" as income from personal services performed in the firm and excluded the payment from gross income under section 911. [3] Petitioner listed his occupation on that return as international business consultant. He reported no income from self-employment and paid no self-employment tax. In his statutory notice of deficiency respondent determined that the earnings petitioner received as a consultant in Egypt were subject to self-employment tax under section 1401. *182 Section 1401[4] imposes a tax on self-employment income. Subsections (a) and (b) of section 1402 define "self-employment income" as the gross income, less certain deductions, derived by an individual from any trade or business carried on by such individual. Section 1402(c)(2) provides that "trade or business" for purposes of self-employment income does not include service as an "employee." Petitioner alleges that throughout 1984 he was employed by the firm as a foreign consultant and that, therefore, his earnings are not subject to tax under section 1401. Petitioner bears the burden of proving the existence of an employment relationship between and the firm. Welch v. Helvering,290 U.S. 111 (1933); *183 Rule 142(a).
Section 1402(d) refers us to section 3121(d) for the applicable definition of "employee." Section 3121(d)(2) defines an "employee" as "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." In short, to determine the existence of an employer-employee relationship this Court must look to common law concepts. Professional & Executive Leasing, Inc. v. Commissioner,89 T.C. 225, 231 (1987), on appeal (9th Cir., Aug. 13, 1987); Packard v. Commissioner,63 T.C. 621, 629 (1975); see also Fahs v. Tree-Gold Co-op. Growers of Florida, Inc.,166 F.2d 40, 43 (5th Cir. 1943). Section 31.3121(d)-1(c)(2), Employment Tax Regs., provides the following definition of the common law employer-employee relationship: (2) Generally such relationship exists when the person for whom services are performed has the right to control *184 and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor. An individual performing services as an independent contractor is not as to such services an *185 employee under the usual common law rules. Individuals such as physicians, lawyers, dentists, veterinarians, construction contractors, public stenographers, and auctioneers, engaged in the pursuit of an independent trade, business, or profession, in which they offer their services to the public, are independent contractors and not employees. Whether the employer-employee relationship exists is a question which must be determined upon the basis of all of the facts and circumstances in each case. Professional & Executive Leasing, Inc. v. Commissioner, supra at 232; Simpson v. Commissioner,64 T.C. 974, 984 (1975); sec. 31.3121(d)-1(c)(3), Employment Tax Regs.
Courts look to several factors in deciding whether an employment relationship exists. Among them are: (1) The degree to which the party for whom the services are performed retains the right to direct the manner in which work is done, the methods used and the details and means by which goals are accomplished; (2) whether the individual performing the work has an opportunity *186 for profit or loss; (3) investment in the work facilities; (4) the permanency of relationship between the paties; (5) the degree to which special skills are required of the individual performing the work; (6) whether the principal has the right to discharge the individual; (7) whether the work performed is a part of the principal's regular business; and (8) the relationship the parties think they are creating. United States v. Silk,331 U.S. 704, 716 (1947); Bartels v. Birmingham,332 U.S. 126, 130 (1947); Professionnal & Executive Leasing, Inc. v. Commissioner, supra at 232; Simpson v. Commissioner, supra at 984-985. The relative importance of these factors must be viewed under the special facts and circumstances of each case. No one factor is controlling. Normally the control factor is the most persuasive factor in determining whether an employment relationship exists. We are mindful, however, that where professional individuals are involved this control "must necessarily be more tenuous and general than the control over nonprofessional employees." James v. Commissioner,25 T.C. 1296, 1301 (1956). *187 In this case petitioner's background and the way in which he came to work for the firm are relevant to our examination of the control factor. Petitioner has enjoyed a distinguished career. He possesses two law degrees the first of which was conferred upon him by Cairo University in 1952. After practicing law in Egypt petitioner served in the Egyptian diplomatic service: first in Cairo and then in New York City, where he was elevated from Vice Consul to Consul. In compliance with Egyptian law petitioner resigned his post in 1964 when he married Mrs. Gamal-Eldin, a United States citizen. They moved to Houston where petition received his American law degree in 1969 and where he helped form the American Arab Chamber of Commerce (hereinafter referred to as the Chamber). In 1974 petitioner opened and directed the Chamber's Cairo office through which, inter alia, petitioner was instrumental in bringing President Anwar el-Sadat to the United States in 1975. Petitioner left his post as President of the Chamber in 1983, the same year in which the Chamber ceased operating due to increasing political tension in the Middle East. In 1983 or 1984, petitioner helped found a law firm in *188 which he became a senior partner. Soon thereafter, the firm and petitioner decided to restructure petitioner's status from attorney-partner to foreign consultant-employee. [5] Consequently, the following changes were made in petitioner's relationship with the firm: (1) petitioner relinquished his partnership interest in the firm; (2) he refrained from entering Egyptian courts or otherwise practicing law in Egypt; (3) he and the firm established separate office space so that Egyptian clients could be segregated and kept away from petitioner; (4) petitioner consulted solely on issues of international laws, conflicts of law and the laws of foreign nations; and (5) petitioner limited his work for Egyptian clients to their affairs outside of Egypt. *189 Petitioner testified that he had no control of the firm other than over the matters to which he was assigned in his new status as foreign consultant-employee. On the basis of this record we find that claim unconvincing. It is apparent that petitioner was invaluable to the expansion of the firm into international legal spheres. In addition to being a founder of the firm petitioner has a background in both United States and Egyptian law, he was a driving force in the firm, he was the most educated and senior in age, no one else in the firm could perform certain aspects of the work he did and he was needed for his knowledge of foreign laws, American law, conflicts of law, comparative law and multinational disputes. Moreover, it is evident from the firm's acquiescence in restructuring its relationship with petitioner that petitioner wielded significant control over the firm even as he relinquished his partnership interest therein. Petitioner testified that the needs of the firm's clients dictated whether he was "assigned" a particular case. Petitioner would become involved only on matters not concerning Egyptian law. Consequently the lawyers would "assign" those matters to petitioner. *190 Once petitioner had completed the work to which he was assigned, we find it hard to imagine that his work product could have been reviewed in any meaningful way simply because there was no one senior to petitioner in terms of knowledge or ability in matters of international law. In sum, while petitioner undoubtedly relinquished his former status as a partner we find that petitioner retained the right to direct the manner and the methods in which his legal work was performed. Second, we consider whether petitioner had an opportunity for profit or loss in his work. Petitioner was paid in one lump sum for 1984. The record is silent whether petitioner was paid prior or subsequent to performance; petitioner testified that he would turn in his expenses upon the disposition of each matter. Petitioner emphasized that he did not share in the profit or loss of the firm since he was not a partner. Petitioner, however, was paid out of the firm's earnings from non-Egyptian sources. On at least two occasions petitioner brought clients to the firm. On the basis of the record before us petitioner failed to prove that he did not have an opportunity for profit in 1984 commensurate with *191 the level of international work undertaken by him on behalf of the firm. Third, we focus on the extent to which each party invested in work facilities. No partner made a capital contribution to the firm upon its formation; rather, the firm apparently began in the offices of the defunct Chamber and succeeded to its library as well. Petitioner testified that the firm "keeps" his office space for him. The fourth factor centers on the permanency of the relationship between the parties. We find no indication in the record that petitioner's new relationship with the firm was anything but permanent. Fifth, we consider the degree to which special skills were required of petitioner. The record is clear that petitioner possessed specialized knowledge and that he had developed important business relationships and personal skills all of which were required for the type of work he performed. Sixth, we inquire whether the firm possessed the right to discharge petitioner during 1984. The firm was economically dependent upon petitioner in view of his expertise in international law. Moreover, petitioner was a founder of the firm which included other members of his family. We find it highly *192 unlikely under these circumstances that petitioner was subject to discharge from the firm. Finally, we turn to the relationship that the parties thought they were creating. Confronted with the impact of Egyptian tax laws, petitioner and his law firm intended simply to recast his relationship with the firm from partner to foreign consultant. We are not persuaded on the basis of the record, that petitioner was ever actually relegated to the role of employee or that such a designation was ever contemplated. We must therefore conclude, upon review of all the circumstances surrounding the relationship between petitioner and the Egyptian law firm, that petitioner was not an employee in 1984 for purposes of exclusion from the self-employment tax. Decision will be entered for the respondent.
Footnotes
1. Hereinafter, all section references are to the Internal Revenue Code as in effect in the year in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Every citizen of the United States is subject to United States income tax on his worldwide income. Sec. 1; sec. 1.1-1(b) Income Tax Regs. Normally, an individual possesses only one citizenship; Egypt, however, continued to confer its citizenship on an individual who became a naturalized United States citizen. See Sadat v. Mertes,615 F.2d 1176 (7th Cir. 1980). A citizen of the United States who maintains dual citizenship remains subject to United States tax. Cf. United States v. Matheson,532 F.2d 809, 816-817 (2d Cir. 1976), cert. denied 429 U.S. 823 (1976); Estate of Vriniotis v. Commissioner,79 T.C. 298, 305↩ (1982). 3. Section 911 provides generally that income from sources within a foreign country earned by a United States citizen residing abroad is excluded from gross income if the taxpayer so elects. Sec. 911↩. 4. For taxable years beginning in 1984 self-employment tax is imposed by section 1401 on self-employment income irrespective of whether section 911 has been properly elected to exclude those same earnings from gross income for income tax purposes. Sec. 1402(a)(11)↩ as amended by sec. 323(b)(1), Social Security Amendments of 1983, Pub. L. 98-21, 97 Stat. 65, 121 effective for taxable years after December 31, 1983. 5. Petitioner at the trial explained the reasons for restructuring his relationship with his Egyptian law firm. It appears that as a partner in an Egyptian law firm practicing law in Egypt he would be subject to a full range of Egyptian taxes. It further appears that, as a "foreign consultant" employed by the Egyptian law firm, his earnings in the capacity of "foreign consultant" would be excluded from Egyptian taxes. To achieve these results, petitioner and the firm simply restructured his status from a senior partner in the firm to that of "senior consultant" employed by the firm. ↩