T.C. Memo. 1996-187


UNITED STATES TAX COURT


ARNOLD P. MORDKIN AND CINDY MORDKIN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 14259-93.              Filed April 17, 1996.


<u>Patrick E. McGinnis</u>, for petitioners.

<u>Janice D. Newell</u> and <u>Mary P. Kimmel</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined the following defi-

ciencies in, additions to, and accuracy-related penalties on

petitioners' Federal income tax:

| | | Additions to Tax Section | Accuracy-Related Penalties Section |
|---|---|---|---|
| Year | Deficiency | 6651(a)(1)[1] | 6662(a) |
| 1989 | $10,628 | $18,337 | $2,126 |
| 1990 | 11,010 | 19,348 | 796 |

[1] All section references are to the Internal Revenue Code (Code) in effect for the years at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

The issues remaining for decision are:

(1)  Is the loss at issue for each of the years 1989 and 1990 a passive activity loss within the meaning of section 469? We hold that it is.

(2)  Are petitioners liable for each of the years 1989 and 1990 for the addition to tax under section 6651(a)?  We hold that they are.

(3)  Are petitioners liable for each of the years 1989 and 1990 for the accuracy-related penalty under section 6662(a)?  We hold that they are.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioners resided in Newport Beach, California, at the time the petition was filed.  They filed joint Federal income tax returns for the years 1989 and 1990.

Petitioner Arnold P. Mordkin[2] is an attorney who was ad- mitted to practice law in California in 1963 and who specialized during all relevant periods in personal injury and medical malpractice matters.  During the years at issue, petitioner, who resided in California, practiced law on a full-time basis as an employee of Arnold P. Mordkin, Inc. (Mordkin, Inc.), a profes- sional corporation located in California, and Mordkin, Inc. was a stockholder of Bridgman, Mordkin, Gould & Shapiro, Inc., a

---

[2]  References to petitioner in the singular are to petitioner Arnold P. Mordkin.

professional corporation also located in California.  During those years, petitioner's legal practice was his primary source of income.

Crestwood Condominiums

In March 1982 and October 1985, petitioner purchased unit no. 2303 and unit no. 2301, respectively, at a condominium development known as Crestwood Condominiums (Crestwood) that is located in Snowmass Village, Colorado (Snowmass Village).  During the years at issue, Crestwood had 141 condominium units that were owned by various persons.

During all relevant periods, Crestwood Condominium Association, Inc. (Crestwood Association), a membership association whose members consisted of all the Crestwood condominium owners, was responsible for the operations at Crestwood.  During those periods, Crestwood Association had a nine-member board of directors (board) that was elected by the members of that association and that oversaw, and made policy regarding, its operations.

During all relevant periods, Crestwood Association ran two separate and distinct operations:  (1) Those operations affecting all Crestwood condominium owners that involved providing services to, and fulfilling the obligations of, those owners, including maintaining and repairing Crestwood's common areas and building structures and obtaining, as required, casualty, public liability and property damage, workmen's compensation and employer's liability insurance as well as other types of insurance that

Crestwood Association deemed appropriate with respect to the real property, buildings, and other improvements at Crestwood (Crestwood Association owners' operations) and (2) those operations affecting only those Crestwood condominium owners who desired to rent their condominium units that involved marketing and managing the rental of those units for short-term periods and providing extensive hotel-type services to the patrons of such rental operations, including on-site management, daily housekeeping service, 24-hour switchboard service, full-service front desk, grocery and liquor shopping service, dinner reservation service, free laundry facilities, and transportation service (Crestwood Association lodge operations).[3]

During all relevant periods, each condominium unit at Crestwood was entitled to one membership in Crestwood Association. Crestwood condominium unit owners were entitled to vote on prescribed matters involving the affairs of Crestwood Association, provided that there was always only one membership in Crestwood Association per condominium unit.[4]

Crestwood condominium unit owners were obligated to pay an annual assessment to fund the payment of all estimated expenses

---

[3] Even though Crestwood Association lodge operations were not separately incorporated, Crestwood Association ran those operations under the name "Crestwood Condominium Association, Inc., d.b.a. Crestwood Lodge, Inc."

[4] If there were two or more owners of a Crestwood condominium unit, those owners held and shared the membership related to that unit in the same proportionate interest and by the same type of tenancy in which the title to that unit was held.

arising out of or connected with the maintenance and operation of Crestwood's common areas, furnishing utility services to the Crestwood condominium units, and other duly authorized functions of Crestwood Association, including management expenses, taxes, common lighting and heating, premiums for all insurance that Crestwood Association was required or permitted to carry, water and sewer charges, trash collection, repairs and maintenance, wages for employees of Crestwood Association, and legal and accounting fees. In addition, Crestwood condominium unit owners were obligated to pay special assessments imposed by Crestwood Association for the cost of any construction or reconstruction, unexpected repair or replacement of improvements at Crestwood, and similar expenditures.

During all relevant periods, each Crestwood condominium owner desiring to participate in the Crestwood Association lodge operations was required to enter into a management agreement (management agreement) with Crestwood Condominium Association, Inc., d.b.a. Crestwood Lodge, Inc. (manager). During relevant periods, petitioner entered into such an agreement with respect to each of his condominium units. Under the management agreement, petitioner employed the manager as the exclusive managing and rental agent to manage his condominium units. Specifically, the manager agreed to perform, inter alia, the following services: Hiring and supervising employees to handle the marketing and rental of those units and all other services required of the

manager, promoting Crestwood as a desirable property available for rental to those who desired lodging during vacation and recreational stays in the Snowmass Village area, entering into rental agreements on behalf of petitioner, collecting rent from tenants, inspecting petitioner's condominium units, maintaining and purchasing necessary equipment and supplies, providing housekeeping and related services, and making necessary repairs and alterations to those units. In return, petitioner agreed to pay the manager an operating charge to offset the cost of the services provided by the manager and all actual costs and expenses incurred by the manager in providing such services. The operating charge was to be determined as follows:

> The proportion which the OWNER shall pay for each billing period shall be a uniform percentage (identical for all properties managed by the MANAGER) of gross rental receipts, which percentage shall be determined by the MANAGER each year by analyzing the percentage of expenses for all properties managed by the MANAGER, as reflected in the annual audit. At the end of each fiscal year the MANAGER will adjust the OWNER'S total operating charge for the year to the percentage reflected in the annual audit as the actual percentage of expenses. If the actual expenses exceed the operating charge for the year, the OWNER agrees to pay the excess; if the actual expenses are less than the operating charge, the MANAGER agrees to refund the difference.

During the years at issue, petitioner rented both of his condominium units. The average period of customer use for petitioner's condominium units was less than seven days.

Participation by Individuals Other Than Petitioner

in the Operations of Crestwood Association

During the years at issue, Crestwood Association maintained a full-time nonmanagement staff of 40 to 85 employees (Crestwood staff) and a full-time management staff of six to eight employees (Crestwood management staff).[5]  The Crestwood staff and the Crestwood management staff ran the daily Crestwood Association owners' operations and lodge operations.  With respect to the daily Crestwood Association lodge operations, in accordance with the terms of the management agreements between certain Crestwood condominium owners, including petitioner, and Crestwood Association, the Crestwood staff and the Crestwood management staff managed and operated the rental of individual condominiums by performing the tasks and providing the services required of the manager in that agreement.

During the years at issue, Larry Dempsey (Mr. Dempsey), vice president, chief operating officer, and general manager of Crestwood Association, was primarily responsible for the day-to-day management of Crestwood Association owners' operations and lodge operations.  During those years, Mr. Dempsey worked between 40 to 80 hours a week and was compensated for his services.  His duties included management of personnel;[6] communication with

---

[5]  The Crestwood management staff included a general manager, assistant general manager, maintenance manager, reservations manager, rooms division manager, housekeeping manager, and controller.

[6]  Mr. Dempsey dealt with day-to-day personnel matters, including
(continued...)

Crestwood condominium owners; execution of documents, contracts, and checks; implementation of the respective annual budgets for the Crestwood Association owners' operations and lodge operations; preparation of items to be discussed at board meetings; and preparation of monthly reports about the daily operations of Crestwood Association to transmit to board members. In addition to his day-to-day responsibilities, Mr. Dempsey undertook special projects on behalf of Crestwood Association, such as communications with the county assessor to ensure proper valuation of condominium units for property tax purposes. Mr. Dempsey's decision-making authority with respect to the operations of Crestwood Association was guided by policies and procedures that were established either by the board or by controlling documents such as the bylaws of Crestwood Association.

During the years at issue, Gretchen Gahm (Ms. Gahm), assistant general manager of Crestwood Association, assisted Mr. Dempsey with the day-to-day management of Crestwood Association owners' operations and lodge operations. During those years, Ms. Gahm worked between 40 to 70 hours a week and was compensated for her services. In addition to her day-to-day responsibilities, Ms. Gahm was involved in quality assurance activities of Crestwood Association. The purpose of quality assurance was to im-

---

[6](...continued)
those relating to the management staff. He was required to consult with the board in dealing with matters relating to the hiring and firing of individuals in key personnel positions and in creating new positions.

prove all aspects of the daily operations of Crestwood Association. Ms. Gahm sought to achieve those objectives by interviewing the Crestwood management staff and evaluating the policies and procedures of the Crestwood Association owners' operations and lodge operations. Although board members, including petitioner, were involved in activities relating to quality assurance, Ms. Gahm directed the process and was primarily responsible for its implementation.

During each of the years at issue, Mr. Dempsey and Ms. Gahm attended the board meetings that were held at Crestwood in the months of January, April, and September. During those meetings, Mr. Dempsey and Ms. Gahm advised the board members of the financial results of the operations of Crestwood Association and of significant issues relating to those operations.[7] In addition, they made recommendations on key issues such as the selection of contractors for the installation of the fire protection system at Crestwood and the assumption of a lease by Crestwood Association on nearby residential property in order to provide housing for its employees.

---

[7] At the board meetings that took place during the years at issue, Mr. Dempsey and Ms. Gahm apprised the board of important issues relating to the operations of Crestwood Association, including the installation of a fire protection system at Crestwood, the proposal by the town of Snowmass Village for terminating its ownership of Crestwood parking lots and roads, the occurrence of fires on the Crestwood property, and employee housing.

During the years at issue, the Crestwood management staff influenced the operations of Crestwood Association by recommending proper rental rates based on surveys and studies, proposing capital improvements and providing cost estimates for such improvements, suggesting adoption of particular employee health insurance plans, preparing budget drafts, and dealing with governmental entities.

Petitioner's Involvement in the
Operations of Crestwood Association

During 1989 and 1990, petitioner was president of Crestwood Association, chairperson of the board of Crestwood Association, and chairperson of the executive committee of that board (executive committee) that was vested with the authority of the board and was to act in the absence of a meeting of the board.  On April 7, 1990, petitioner was appointed chairperson of the management compensation committee of the board (management compensation committee).  Petitioner received no compensation during the years at issue for serving in any of those positions.

During the years at issue, as chairperson of the executive committee, petitioner considered various issues relating to the operations of Crestwood Association.  During 1989, as chairperson of the executive committee, petitioner considered issues relating to the installation of a fire sprinkler system at Crestwood. Although during the January 1989 board meeting the board had given the executive committee the authority to enter into the

final contract with respect to the installation of a fire sprinkler system at Crestwood, after considering that issue, the executive committee chose not to act on it and instead decided to leave the matter for consideration by the entire board.  During 1990, as chairperson of the executive committee, petitioner considered a Crestwood condominium owner's request to combine two condominium units and drafted a letter to another Crestwood condominium owner to address that owner's complaint regarding the placement of humidifiers in all condominium units.

During 1990, as chairperson of the management compensation committee, petitioner discussed the issue of management compensation with Mr. Dempsey and suggested the implementation of an incentive program for the Crestwood management staff.

During each of the years at issue, petitioner attended the three board meetings that were held at Crestwood in the months of January, April, and September, and, as chairperson of the board, presided over those meetings.  He arrived at Crestwood in December about two weeks prior to each of the board meetings held in January 1989 and 1990.  While at Crestwood during that two-week period preceding each of those meetings, he attended one or two owners' receptions at which owners, board members, and senior management staff had the opportunity to interact and discuss matters relating to the operations of Crestwood Association and an employee Christmas party in order to gain insight as to the

operations of Crestwood Association.  Petitioner also attended owners' receptions that were held immediately after the January 1989 and January 1990 board meetings.

Petitioner arrived at Crestwood approximately one to two days prior to each of the board meetings held in April 1989 and 1990 and two to three days prior to each of the board meetings held in September 1989 and 1990.

Prior to each of the board meetings held in January, April, and September of each of the years 1989 and 1990, while petitioner was present at Crestwood, he spent time attending to matters that related to Crestwood Association owners' operations and lodge operations.  For example, he met with the Crestwood management staff to discuss, inter alia, personnel issues, the status of rentals, owner inquiries, and patron complaints.

In preparation for an upcoming board meeting during each of the years 1989 and 1990, petitioner met with Mr. Dempsey and Ms. Gahm to discuss the agenda for the board meeting, met with the Crestwood management employees to obtain their perspectives on issues that were to be raised at the upcoming board meeting, and worked with those employees to prepare information packets offered to board members and owners.

In addition to spending time on matters relating to Crestwood Association owners' operations and lodge operations, prior to each of the board meetings in 1989 and 1990, petitioner spent an undisclosed amount of time inspecting his two condominium units.

Petitioner spent a total of approximately 16 to 24 hours prior to each of the board meetings held in January and September of each of the years 1989 and 1990 and a total of approximately eight to 16 hours prior to each of the board meetings held in April of each of the years 1989 and 1990 to attend to matters that related to Crestwood Association owners' operations and lodge operations and to attend to matters that related exclusively to his two condominium units (i.e., inspecting those units).

During the years at issue, each of the board meetings over which petitioner presided lasted approximately three to six hours. During those meetings, the board, inter alia, reviewed reports that were submitted by individual committees of the board relating to rental rates and usage,[8] insurance,[9] capital improvements,[10] budgets,[11] facilities,[12] nominations,[13] and management

---

[8] The Crestwood management staff conducted studies and surveys to determine the proper rental rates and made recommendations to the board. The board considered those recommendations and made the final decision with respect to rental rates.

[9] The Crestwood management staff and the insurance committee of the board apprised the board of various employee health insurance plans and the cost of each plan and made recommendations to the board about the selection of a particular plan. They also apprised the board of insurance premium increases and renewal of those insurance plans. The board made the final decision with respect to the selection and renewal of such plans.

[10] Proposals for capital improvements were made by the Crestwood management staff and/or the capital improvements committee of the board. The board examined each proposal, considered the cost of each proposal, and generally adopted the proposals made with regard to capital improvements.

[11] The respective annual budgets for the Crestwood Association owners' operations and lodge operations were prepared by the

(continued...)

compensation. At the board meetings that occurred during the years at issue, the board, inter alia, also reviewed reports submitted by the Crestwood management staff relating to the following issues: (1) The operations of Crestwood Association, (2) its financial results, (3) the installation of a fire protection system at Crestwood,[14] (4) the proposal by the town of Snowmass Village for terminating its ownership of Crestwood's parking lots and roads,[15] (5) the occurrence of fires on the Crestwood

---

[11](...continued)
budget committee of the board with assistance from the Crestwood management staff and submitted by that committee to the board for approval.

[12] The facilities committee of the board advised the board of the quality of housekeeping services, quality of maintenance services, and structural problems with the Crestwood buildings, and it proposed that certain improvements be made to the rental units.

[13] During each of the board meetings in September 1989 and 1990, the board considered the nominations of candidates to serve as its members.

[14] During each of the board meetings in January and April 1989, the board considered issues relating to the installation of a fire protection system at Crestwood, reviewed the bids submitted by various contractors for the installation of such a system, and selected contractors after giving consideration to the recommendations made by the Crestwood management staff. During each of the board meetings in September 1989 and January 1990, the Crestwood management staff apprised the board of issues relating to the completion of that project.

[15] The town of Snowmass Village owned and maintained the parking lots and roadways of Crestwood. The town sought to terminate that ownership and to shift the maintenance responsibilities to Crestwood Association. During the April 1989 board meeting, the Crestwood management staff advised the board of that matter, and the board charged the Crestwood management staff with the responsibility of resisting the town's attempt to terminate that owner-
(continued...)

property, (6) employee housing,[16] (7) structural repairs to the Crestwood buildings, and (8) the creation of a new position on the Crestwood staff.

In addition to the foregoing issues, at its meetings during the years at issue, the board, inter alia, considered issues relating to the election of officers, inquiries and complaints raised by owners and patrons of Crestwood condominiums, a proposed amendment to the bylaws of Crestwood Association dealing with nepotism, the promotion of rental operations, the revision of the guide for prospective buyers of Crestwood condominium units, and the rehiring of Crestwood Association's outside auditor.[17]

Moreover, during the board meetings held in January of each of the years at issue, the board reviewed respective audit reports for the Crestwood Association owners' operations and lodge

---

[15](...continued)
ship. During each of the board meetings in September 1989, January 1990, and September 1990, the Crestwood management staff apprised the board of the town's actions with respect to that issue.

[16] During the September 1989 board meeting, based on recommendations made by the Crestwood management staff, the board resolved to assume a lease on nearby residential property in order to provide housing for the employees of Crestwood Association. During each of the board meetings in January 1990 and September 1990, the Crestwood management staff apprised the board of issues relating to employee housing.

[17] During the September 1990 board meeting, the board acknowledged the expiration of Crestwood Association's contract with its outside auditor and authorized the Crestwood management staff to renegotiate a new contract with that auditor.

operations that were prepared by the outside auditor of Crestwood Association.

During each of the years at issue, the Crestwood Association had an annual meeting of all its members (owners' meeting) that was held at Crestwood immediately after the January board meeting. As president of Crestwood Association, petitioner presided over that meeting. The owners' meeting lasted approximately one to two hours. The owners attending that meeting received a summary audit report and were advised of significant activities of the board.

During the years at issue, in his capacity as a board member and/or an officer of Crestwood Association, petitioner was involved in quality assurance activities of Crestwood Association. Petitioner expressed a strong interest in quality assurance and collaborated with Ms. Gahm to ensure the implementation of policies to improve all aspects of the daily Crestwood Association owners' operations and lodge operations. During the years at issue, petitioner communicated by telephone with Ms. Gahm and other members of the Crestwood staff regarding quality assurance and met with them in person regarding that matter during his visits to Crestwood in the months of January, April, and September of each of the years at issue.

Throughout each of the years at issue, petitioner reviewed the respective monthly financial statements of Crestwood Association owners' operations and lodge operations and had telephonic

conversations with Mr. Dempsey regarding items that appeared on those statements. He also discussed matters relating to any upcoming board meeting with the Crestwood management staff prior to arriving at Crestwood. In addition, petitioner had telephonic conversations with the Crestwood management staff regarding matters relating to the operations of Crestwood Association, the installation of the fire protection system at Crestwood, the proposal by the town of Snowmass Village to terminate its owner-ship of Crestwood roads and parking lots, and employee housing. Petitioner also contacted the respective chairpersons of the various committees of the board (e.g., insurance, rental rates and usage, budget, nominations, and management compensation committees) to gain insight as to their activities.

Petitioner spent at least 6.7 hours during 1989 and 9.8 hours during 1990 on telephone calls between southern California and Colorado.

During each of the years at issue, petitioner spent a total of at least 75 hours, but no more than 135 hours, in attending to matters relating to the Crestwood Association owners' operations and lodge operations and in attending to matters relating ex-clusively to his two condominium units at Crestwood.

Petitioner's Involvement in the Operations
of Crestwood Association During the Years
1985 through 1988

During the years 1985 through 1988, petitioner was a member of the board and served on various committees of that board. The

board's activities during those years were similar to its activities during 1989 and 1990. During each of the years 1985 through 1988, petitioner spent substantially less than 500 hours in attending to matters relating to Crestwood Association owners' operations and lodge operations and spent less time in those operations than he spent in those operations during each of the years at issue.

Petitioners' Federal Income Tax Returns

For the years 1987 and 1988, petitioners' Federal income tax returns reflected tax liabilities of $16,405 and $62,341, respectively.

Petitioners filed a Form 4868, Application for Automatic Extension of Time to File U.S. Individual Income Tax Return (application for automatic extension) dated April 13, 1990, requesting a four-month extension of time to file their Federal income tax return for 1989 (1989 return). Line 1 of the application for automatic extension that petitioners filed for 1989 provided as follows:

> Total tax liability for 1989. This is the amount you expect to enter on line 24 of Form 1040A, or line 55 of Form 1040. If you do not expect to owe tax, enter zero (-0-) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> **Caution:** You **MUST** enter an amount on line 1 or your extension will be denied. You can estimate this amount; but be as exact as you can with the information you have. If we later find that your estimate was not reasonable, the extension will be null and void.

Petitioners' application for automatic extension for 1989 indi-

cated on line 1 a zero estimated Federal income tax liability for petitioners for that year, was signed by petitioners, and was sent to the Internal Revenue Service (Service).

Petitioners filed a Federal income tax return for 1989 dated October 15, 1990. In that return, petitioners reported total salaries of $315,662. The portion of those reported salaries that was attributable to petitioner's legal practice was $311,000. In their 1989 return, petitioners reported a loss of $45,666 attributable to petitioner's rental activity at Crestwood. Petitioners used that reported loss of $45,666 to offset other income reported in their 1989 return. Petitioners' 1989 return showed a tax liability of $66,958. That return was signed by petitioners as taxpayers and was signed by "Edward A. Cronick, CPA" as return preparer.

Petitioners filed an application for automatic extension dated April 12, 1991, requesting a four-month extension of time to file their Federal income tax return for 1990 (1990 return). Line 1 of that application was virtually identical to line 1 of the application for automatic extension for 1989 and provided exactly the same caution. Petitioners' application for automatic extension for 1990 indicated on line 1 a zero estimated Federal income tax liability for petitioners for that year, was not signed by petitioners, was signed by "Edward A. Cronick CPA" as preparer of the application, and was sent to the Service.

Petitioners filed a Form 2688, Application for Additional Extension of Time to File U.S. Individual Income Tax Return dated August 9, 1991, requesting an additional two-month extension of time to file their 1990 return. That application indicated that petitioners needed the additional time to "collect and summarize the information necessary to file an accurate return." That application was not signed by petitioners, was signed by "Edward A. Cronick CPA" as preparer of the application, and was sent to the Service.

Petitioners filed a Federal income tax return for 1990 dated October 14, 1991. In that return, petitioners reported total salaries of $359,962. The portion of those reported salaries that was attributable to petitioner's legal practice was $349,000. In their 1990 return, petitioners reported a loss of $48,082 attributable to petitioner's rental activity at Crestwood. Petitioners used that reported loss of $48,082 to offset other income reported in their 1990 return. Petitioners' 1990 Federal income tax return showed a tax liability of $70,742. That return was signed by petitioners as taxpayers and was signed by "Edward A. Cronick, CPA" as return preparer.

Petitioner did not have any formal tax or accounting training. However, petitioner was a sophisticated businessman and had been involved in several tax shelters that were challenged by the Service. In addition, during the board meeting held in January

1988, petitioner and other board members were informed by accountants of the limitations imposed on the Crestwood condominium owners in deducting for Federal income tax purposes losses from their respective rental activities at Crestwood.

## OPINION

Petitioners bear the burden of proving that respondent's determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

## The General Framework of Section 469 and the Regulations Thereunder and the Positions of the Parties

Pursuant to section 469(a), a passive activity loss of an individual for the taxable year is generally not allowed as a deduction for such year.[18] For this purpose, the passive activity loss for the taxable year is generally the amount, if any, by which the passive activity deductions for the taxable year exceed the passive activity gross income for such year. Sec. 469(d)(1); sec. 1.469-2T(b)(1), Temporary Income Tax Regs., 53 Fed. Reg. 5711 (Feb. 25, 1988).

As pertinent here, section 469(c) defines the term "passive activity" to include: (1) Any activity which involves the conduct of any trade or business and in which the taxpayer does not materially participate, sec. 469(c)(1), and (2) any rental activity without regard to whether or not the taxpayer materially

---

[18] Under sec. 469(b), a disallowed passive activity loss for a taxable year is generally treated as a deduction allocable to a passive activity for the next taxable year.

participates in the activity, sec. 469(c)(2), (4).

For purposes of section 469(c)(1), the term "trade or business" is defined in section 469(c)(6) to include any activity in connection with a trade or business or any activity with respect to which expenses are allowable as a deduction under section 212.

For purposes of section 469(c)(2), the term "rental activity" is defined in section 469(j)(8) as any activity where payments are principally for the use of tangible property. See also sec. 1.469-1T(e)(3)(i), Temporary Income Tax Regs., 53 Fed. Reg. 5702 (Feb. 25, 1988). However, an activity involving the use of tangible property is not a rental activity for a taxable year, inter alia, if for such taxable year the average period of customer use for such property is seven days or less. Sec. 1.469-1T(e)(3)(i) and (ii)(A), Temporary Income Tax Regs., supra.

In the instant case, the parties have stipulated that the average period of customer use of petitioner's condominiums at Crestwood was less than seven days during each of the years at issue. Respondent concedes on brief, and the parties thus agree, that, consequently, petitioner's rental activity at Crestwood during each such year is not a rental activity as defined in section 469(j)(8) and the regulations thereunder and thus is not a passive activity under section 469(c)(2). See sec. 1.469-1T(e)(3)(i) and (ii)(A), Temporary Income Tax Regs., supra.

The parties do not dispute that petitioner's rental activity at Crestwood during each year at issue constitutes an activity

that is treated as a trade or business under section 469(c)(6).
Consequently, petitioner's rental activity at Crestwood will
constitute a passive activity under section 469(c)(1) for each of
those years if he did not materially participate in that activity
during each such year.  See sec. 469(c)(1).

Section 469(h)(1) provides that generally an individual
shall be treated as materially participating in an activity only
if he or she is involved in the operations of the activity on a
basis that is regular, continuous, and substantial.  Congress
expressly authorized the Secretary of the Treasury (Secretary) to
prescribe such regulations as may be necessary or appropriate to
carry out the provisions of section 469, including regulations
that specify what constitutes material participation.  Sec.
469(l)(1).

Both temporary and final regulations relating to the meaning
of the terms "participation" and "material participation" have
been promulgated under section 469.  With respect to the term
"participation", final regulations issued under section 469
provide that generally "any work done by an individual (without
regard to the capacity in which the individual does the work) in
connection with an activity in which the individual owns an
interest at the time the work is done shall be treated for pur-
poses of this section as participation of the individual in the
activity."  Sec. 1.469-5(f)(1), Income Tax Regs.  Temporary
regulations issued under section 469 provide certain exceptions

to that definition of participation.  As pertinent here, section 1.469-5T(f)(2)(ii)(A), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988), provides that work done by an individual in such individual's capacity as an investor in an activity shall not be treated as participation by the individual in the activity unless the individual is involved in the day-to-day management or operations of the activity.  For this purpose, work done by an individual in such individual's capacity as an investor in an activity includes:

    (1) Studying and reviewing financial statements or reports on operations of the activity;

    (2) Preparing or compiling summaries or analyses of the finances or operations of the activity for the individual's own use; and

    (3) Monitoring the finances or operations of the activity in a non-managerial capacity.  [Sec. 1.469-5T(f)(2)(ii)(B), Temporary Income Tax Regs., supra.]

Temporary regulations relating to the meaning of the term "material participation" in section 469(h)(1) provide that, in general,

    an individual shall be treated, for purposes of section 469 and the regulations thereunder, as materially participating in an activity for the taxable year if and only if--

    (1) The individual participates in the activity for more than 500 hours during such year;

    (2) The individual's participation in the activity for the taxable year constitutes substantially all of the participation in such activity of all individuals (including individuals who are not owners of interests in the activity) for such year;

    (3) The individual participates in the activity

for more than 100 hours during the taxable year, and such individual's participation in the activity for the taxable year is not less than the participation in the activity of any other individual (including individuals who are not owners of interests in the activity) for such year;

(4) The activity is a significant participation activity (within the meaning of paragraph (c) of this section) for the taxable year, and the individual's aggregate participation in all significant participation activities during such year exceeds 500 hours;

(5) The individual materially participated in the activity (determined without regard to this paragraph (a)(5)) for any five taxable years (whether or not consecutive) during the ten taxable years that immediately precede the taxable year;

(6) The activity is a personal service activity (within the meaning of paragraph (d) of this section), and the individual materially participated in the activity for any three taxable years (whether or not consecutive) preceding the taxable year; or

(7) Based on all of the facts and circumstances (taking into account the rules in paragraph (b) of this section), the individual participates in the activity on a regular, continuous, and substantial basis during such year. [Sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725-5726 (Feb. 25, 1988).]

Petitioners challenge the validity of section 1.469-5T(a)(1), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988), and argue that, in any event, they satisfy that regulation as well as section 1.469-5T(a)(6) and (7), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988).[19]  According to peti--

---

[19]  In their trial memorandum, petitioners argued that petitioner materially participated in his rental activity at Crestwood because he satisfies sec. 1.469-5T(a)(5), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988).  Petitioners do not advance that argument on brief.  Accordingly, we conclude that petitioners have abandoned it.  See Rybak v. Commissioner, 91 T.C. 524, 566 n.19 (1988).

tioners, petitioner materially participated in his rental activity at Crestwood during each of the years at issue, that activity thus is not a passive activity within the meaning of section 469(c)(1), and the loss petitioners reported in their return for each of those years therefore is not a passive activity loss as defined in section 469(d)(1) that is subject to disallowance by section 469(a)(1).  Respondent counters that section 1.469-5T(a)(1), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988), is valid and that in no event do petitioners satisfy that regulation or section 1.469-5T(a)(6) or (7), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988).

Certain Preliminary Issues

Before turning our attention to the regulatory provisions on which petitioners rely to establish that petitioner materially participated during each of the years at issue in his rental activity at Crestwood, we shall address two preliminary issues.

The first preliminary issue we address is whether respondent is correct in contending that the work done by petitioner in connection with the operations of Crestwood Association was work done in his capacity as an investor in Crestwood under section 1.469-5T(f)(2)(ii)(B), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988), that does not constitute participation for purposes of section 469 because it is excluded by section 1.469-5T(f)(2)(ii)(A), Temporary Income Tax Regs., supra.  Our answer is no.  During 1989 and 1990, as president of Crestwood Associa-

tion, chairperson of the board of Crestwood Association, chairperson of the executive committee, and chairperson of the management compensation committee, petitioner spent time dealing with a wide range of issues relating to the operations of Crestwood Association.  By way of illustration, petitioner dealt with issues relating to the installation of the fire protection system at Crestwood, the proposal by the town of Snowmass Village for terminating its ownership of the Crestwood roads and parking lots, employee housing, quality assurance, and management compensation.  The work done by petitioner in his capacity as a board member and an officer of Crestwood Association was work he did in the management of the operations of Crestwood Association and was not the type of work that is considered investor participation within the meaning of section 1.469-5T(f)(2)(ii)(B), Temporary Income Tax Regs., supra.

The second preliminary issue we address is whether petitioner's involvement as a board member and an officer in the operations of Crestwood Association constitutes participation by petitioner in his rental activity at Crestwood within the meaning of section 1.469-5(f)(1), Income Tax Regs.  We note that, in those capacities during the years at issue, petitioner dealt with a wide range of issues that affected not only the two Crestwood condominium units he owned, but also all other Crestwood condominium units.  At trial and on brief, petitioners assume, with no discussion or explanation of the basis for such an assumption,

that all of the work done by petitioner during the years at issue in his capacity as a board member and an officer of Crestwood Association in connection with the operations of Crestwood Association constitutes work done by him in connection with his rental activity at Crestwood that satisfies the definition of the term "participation" in section 1.469-5(f)(1), Income Tax Regs. Respondent does not dispute, or even address, that assumption. Therefore, we shall proceed on the same assumption, although we are in no way deciding herein that it is a correct assumption.[20] In this connection, assuming arguendo, as petitioners and respondent do, that all of the work done by petitioner during the years at issue in his capacity as a board member and an officer of Crestwood Association were work done by him in connection with his rental activity at Crestwood within the meaning of section 1.469-5(f)(1), Income Tax Regs., on the instant record, we find below that petitioners nonetheless have failed to prove that such work, together with any work petitioner may have done that related exclusively to his two condominium units, constitutes material participation by petitioner in his rental activity at Crestwood for purposes of section 469 and the regulations thereunder.

---

[20] We note that on the record before us we have no way of determining how much of the work done by petitioner during the years at issue in connection with the operations of Crestwood Association related, or should be treated as related, solely to his two condominium units.

Section 1.469-5T(a)(1), Temporary Income Tax Regs.

    Petitioners' Challenge to the Validity of Section
1.469-5T(a)(1), Temporary Income Tax Regs.

Although their argument is not altogether clear, as we understand it, petitioners contend that section 1.469-5T(a)(1), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988), is invalid because, by requiring an individual to participate in an activity for more than 500 hours during a taxable year in order to be treated as materially participating in that activity for such year, that regulation is quantitative, rather than qualitative, in nature, and, consequently, it is an unreasonable interpretation of section 469(h)(1).

Initially, we note that temporary regulations have binding effect and are entitled to the same weight as final regulations. Peterson Marital Trust v. Commissioner, 102 T.C. 790, 797 (1994), affd. ___ F.3d ___ (2d Cir., Mar. 4, 1996); Truck & Equip. Corp. v. Commissioner, 98 T.C. 141, 149 (1992); see LeCroy Research Sys. Corp. v. Commissioner, 751 F.2d 123, 127 (2d Cir. 1984), revg. on other grounds T.C. Memo. 1984-145. Therefore, in determining the validity of temporary regulations, we apply the same analysis as that used in determining the validity of final regulations. Schaefer v. Commissioner, 105 T.C. 227, 229 (1995).

The judicial deference accorded to a regulation generally depends on whether the regulation is classified as a legislative or an interpretative regulation. See Dresser Indus., Inc. v.

<u>Commissioner</u>, 911 F.2d 1128, 1137-1138 (5th Cir. 1990), affg. in part and revg. in part 92 T.C. 1276 (1989).  The source of the authority under which a regulation is promulgated will be determinative of such classification.  <u>Id.</u> at 1137.  A legislative regulation that is "issued under a specific grant of authority to define a statutory term or prescribe a method of executing a statutory provision" is to be accorded more weight than an interpretative regulation that is promulgated under the more general authority of section 7805(a).  See <u>United States v. Vogel Fertilizer Co.</u>, 455 U.S. 16, 24 (1982) (quoting <u>Rowan Cos. v. United States</u>, 452 U.S. 247, 253 (1981)).

There are two possible sources of authority for the issuance by the Secretary of section 1.469-5T(a)(1), Temporary Income Tax Regs., <u>supra</u>, the validity of which petitioners challenge: (1) The general authority granted to the Secretary by section 7805(a)[21] or (2) the specific legislative authority granted to the Secretary by section 469(l)(1) to prescribe regulations that specify what constitutes material participation.

If section 1.469-5T(a)(1), Temporary Income Tax Regs., <u>supra</u>, that petitioners challenge were promulgated pursuant to the general authority granted to the Secretary by section 7805(a), it would be considered an interpretative regulation.

_____

[21]  Sec. 7805(a) provides in pertinent part that "the Secretary shall prescribe all needful rules and regulations for the enforcement of this title".

See Dresser Indus., Inc. v. Commissioner, supra at 1137-1138. An interpretative regulation must be upheld if it "implement[s] the congressional mandate in some reasonable manner". National Muffler Dealers Association, Inc. v. United States, 440 U.S. 472, 476-477 (1979) (quoting United States v. Cartwright, 411 U.S. 546, 550 (1973)). In determining whether an interpretative regulation implements the congressional mandate in some reasonable manner, we must examine whether it "harmonizes with the plain language of the statute, its origin, and its purpose." National Muffler Dealers Association, Inc. v. United States, supra at 477. Such a regulation cannot be declared invalid, unless it is "unreasonable and plainly inconsistent with the revenue statutes". Commissioner v. South Texas Lumber Co., 333 U.S. 496, 501 (1948). The Supreme Court recently set forth the following standard for ascertaining the validity of an interpretative regulation:

> Under the formulation now familiar, when we confront an expert administrator's statutory exposition, we inquire first whether "the intent of Congress is clear" as to "the precise question at issue." Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842 (1984). If so, "that is the end of the matter." Ibid. But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id., at 843. If the administrator's reading fills a gap or defines a term in a way that is reasonable in light of the legislature's revealed design, we give the administrator's judgment "controlling weight." Id., at 844. [NationsBank v. Variable Annuity Life Ins. Co., 513 U.S. ___, ___, 115 S. Ct. 810, 813-814 (1995); citations omitted.]

In determining the validity of an interpretative regulation, the

Supreme Court has acknowledged that "The choice among reasonable interpretations is for the Commissioner, not the courts." National Muffler Dealers Association, Inc. v. United States, supra at 488.

If section 1.469-5T(a)(1), Temporary Income Tax Regs., supra, that petitioners challenge were promulgated pursuant to the specific legislative authority of section 469(l)(1), it would be considered a legislative regulation.  See Dresser Indus., Inc. v. Commissioner, supra at 1137.  A legislative regulation must be upheld unless it is "arbitrary, capricious, or manifestly contrary to the underlying statute."  Id.

Petitioners contend that the regulation they challenge should be classified as an interpretative regulation.  Although section 469(l)(1) delegates legislative authority to the Secretary to prescribe regulations that specify what constitutes material participation, in arguing the validity of section 1.469-5T(a)(1), supra, respondent applies the standard used in judging the validity of an interpretative regulation.  We need not resolve the question whether section 1.469-5T(a)(1), Temporary Income Tax Regs., supra, is an interpretative or a legislative regulation.  This is because assuming arguendo, as petitioners contend, and respondent does not dispute, that that regulation were an interpretative, and not a legislative, regulation, we would nonetheless uphold its validity because we conclude that section 1.469-5T(a)(1), Temporary Income Tax Regs., supra,

implements the congressional mandate in a reasonable manner, the standard of review for an interpretative regulation.  A fortiori that regulation would not be arbitrary, capricious, or manifestly contrary to the underlying statute, the higher standard of review for a legislative regulation.

In determining the validity of section 1.469-5T(a)(1), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988), we note first that that regulation in effect establishes a safe harbor under which an individual may establish, without more, that he or she satisfies the definition of material participation in section 469(h)(1).  However, neither petitioner nor any other individual subject to section 469 is required to meet the minimum hourly requirement of section 1.469-5T(a)(1), Temporary Income Tax Regs., supra, in order to be treated as materially participating in an activity.  An individual may satisfy the material participation requirement by qualifying under that or any one of six other alternative tests set forth in section 1.469-5T(a)(2) through (7), Temporary Income Tax Regs., 53 Fed. Reg. 5725-5726 (Feb. 25, 1988).  For example, an individual may be treated as materially participating in an activity if his or her participation in that activity during the taxable year constitutes "substantially all of the participation in such activity of all individuals (including individuals who are not owners of interests in the activity) for such year".  Sec. 1.469-5T(a)(2), Temporary Income Tax Regs., supra; see also H. Conf. Rept. 99-841 (Vol.

II), at II-148 (1986), 1986-3 C.B. (Vol. 4) 134, 148.

In any event, we shall consider the language of section 469(h)(1) and its underlying legislative history to determine whether section 1.469-5T(a)(1), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988), is a reasonable construction of that statute.  That Code section provides:

> A taxpayer shall be treated as materially participating in an activity only if the taxpayer is involved in the operations of the activity on a basis which is--
>
> (A) regular,
> (B) continuous, and
> (C) substantial.

Although neither section 469(h)(1) nor any other provision in section 469 prescribes any specific standards for determining whether a taxpayer is involved in the operations of an activity on a regular, continuous, and substantial basis, the material participation test imposed by that section is, without question, time sensitive in nature.  A taxpayer cannot be involved in the operations of an activity unless that taxpayer spends time in connection with those operations.  While the determination of whether an individual's involvement in the operations of an activity constitutes participation for purposes of section 469 requires an examination of the nature of the individual's in-volvement in those operations, the determination of whether an individual's participation is material requires an examination of the amount and extent of such involvement.  Section 469(h)(1) prescribes that the amount and extent of such involvement be

regular, continuous, and substantial.  We conclude that the material participation test imposed by section 469(h)(1) implicates the amount and extent of time that a taxpayer spends being involved in the operations of an activity.

In advancing their argument that section 1.469-5T(a)(1), Temporary Income Tax Regs., supra, is invalid because it is quantitative, rather than qualitative, in nature, petitioners rely on the following colloquy on the floor of the U.S. Senate between Senator Hatfield and Senator Packwood:

> Mr. HATFIELD.  Such a taxpayer's involvement in the hotel room rental business includes making the following management decisions which an owner of such business commonly or customarily makes in conducting such business:  First, the taxpayer actively and regularly establishes the rental rate of the hotel room; second, the taxpayer participates in establishing and reviewing hiring and other personnel policies, including review of management personnel; third, the taxpayer reviews and approves periodic and annually audited financial reports; fourth, the taxpayer participates in budgeting operating costs and establishing capital expenditures; fifth, the taxpayer establishes the need for and level of financial reserves; sixth, the taxpayer selects the banking depository for rental proceeds and reserve funds; seventh, the taxpayer has frequent meetings at the hotel with his agent and onsite contract management to review operations and the business plan, and to conduct onsite inspections; eighth, the taxpayer assists in offsite business promotion activities; * * *

> *     *     *     *     *     *     *

> Mr. PACKWOOD.  If the taxpayer can demonstrate that he had performed and is performing all those functions which you have described which are integral to the operations of hotel room rental business and is performing them in such a way and to such an extent that it demonstrates that the taxpayer's involvement in the operation of the activity is substantial, continuous and ongoing, you are correct, such activity would be

material participation in the operation of the hotel
room rental business.  [132 Cong. Rec. 15032 (1986).]

The foregoing colloquy between Senator Hatfield and Senator Packwood makes it clear that services performed by a taxpayer that are deemed integral to the operations of a condominium hotel will constitute material participation by the taxpayer in those operations only if the taxpayer performs those services in such a way and "to such an extent" that it shows that the taxpayer's involvement in those operations is regular, continuous, and substantial.  Id.  Contrary to petitioner's contention, that colloquy does not in any way suggest that, in determining whether a taxpayer's participation in the operations of an activity is material, it is unreasonable to examine the amount and extent of time spent by the taxpayer in those operations.

Indeed, a review of other portions of the legislative history of section 469 confirms that the material participation test implicates the amount and extent of the time spent by a taxpayer in connection with the operations of an activity.  For instance, that legislative history indicates that a taxpayer is most likely to participate materially in an activity if involvement in that activity is the taxpayer's principal business and the taxpayer devotes most of his or her time to that business and does not devote a comparable amount of time to another business (principal business factor).  S. Rept. 99-313 (1986), 1986-3 C.B. (Vol. 3) 713, 732-733.  The legislative history of section 469 also indi-

cates that a taxpayer's regular presence at the place where the principal operations of an activity are conducted is indicative of material participation (regular presence factor).  S. Rept. 99-313, supra, 1986-3 C.B. (Vol. 3) at 733.  Although neither the principal business factor nor the regular presence factor is conclusive in the determination of material participation, the relevance of both factors in that determination demonstrates that the time actually spent by an individual in connection with the operations of an activity is an important factor in the determination of material participation.

We further note that the legislative history of section 469 indicates that, in order for a taxpayer to participate materially in an activity, the taxpayer must significantly contribute to services that are deemed integral to the operations of the activity.  S. Rept. 99-313, supra, 1986-3 C.B. (Vol. 3) at 732.  It seems to us that a taxpayer cannot contribute significantly to such services unless that taxpayer devotes time in connection with such services.

A discussion in the legislative history of section 469 with respect to the performance of management services sheds additional light on the meaning and quantitative nature of the term "material participation".  That legislative history provides in pertinent part:

> Participation in management cannot be relied upon
> unduly both because its genuineness and substantiality
> are difficult to verify, and because a general manage-

ment role, absent more, may fall short of the level of
involvement that the material participation standard in
the provision is meant to require.  [S. Rept. 99-313,
supra, 1986-3 C.B. (Vol. 3) at 734-735.]

That legislative history further states in pertinent part:

It is clarified that an individual who works full-time
in a line of business consisting of one or more busi-
ness activities generally is likely to be materially
participating in those activities * * * even if the
individual's role is in management rather than opera-
tions.

This clarification * * *. * * * recognizes the
substantial likelihood that, despite the difficulty in
many circumstances of ascertaining whether the manage-
ment services rendered by an individual are substantial
and bona fide, such services are likely to be so when
the individual is rendering them on a full-time basis
and the success of the activity depends in large part
upon his exercise of business judgment.  [H. Conf.
Rept. 99-841 (Vol. II), supra, 1986-3 C.B. (Vol. 4) at
147-148.]

In addition, we believe that a material participation test

that focuses on the amount and extent of time spent by a taxpayer

in connection with the operations of an activity is consistent

with the underlying purpose of section 469.  Congress added the

passive activity loss rules to the Code in 1986 as a response to

the prevalent use of tax shelters and as an attempt to foster

equity within the tax system.  S. Rept. 99-313, supra, 1986-3

C.B. (Vol. 3) at 713-714; see Adler v. United States, 32 Fed. Cl.

736, 738 (1995).  Prior to 1986, taxpayers often reduced their

tax liability by investing in business ventures that generated

tax losses in excess of economic losses and by using those

artificial losses to offset unrelated income (e.g., salary or

portfolio income).  S. Rept. 99-313, supra, 1986-3 C.B. (Vol. 3) at 713.  The passive activity loss rules in section 469 curtail the use of tax shelters by restricting a taxpayer's ability to use the losses sustained in the operation of a trade or business to shelter unrelated income, unless the taxpayer materially participates in the operation of that trade or business.  Id. at 716.

A material participation test that implicates the amount and extent of time a taxpayer spends being involved in the operations of a particular activity helps to achieve the underlying purpose of section 469, since the greater the amount of time devoted by the taxpayer to the activity, the greater the likelihood that the taxpayer invested in the activity based on the nontax economic profit potential of the activity as opposed to the potential for return on the investment in the form of a reduction of taxes on unrelated income.  In addition, it seems to us that a material participation test that considers the amount and extent of time spent by a taxpayer in an activity will have the intended effect of restricting the use of losses from certain types of trade or business activities that Congress decided to treat as passive activities, since few persons who make an investment in a tradi-tional tax shelter devote a substantial amount of time to any such investment.

Based on our examination of section 469 and its legislative history, and section 1.469-5T(a)(1), Temporary Income Tax Regs.,

53 Fed. Reg. 5725 (Feb. 25, 1988), we reject petitioners' argument that, because that regulation is quantitative in nature, it is an unreasonable interpretation of section 469(h)(1) and thus is invalid.[22]  We conclude that that regulation implements section 469(h)(1) in a reasonable manner by providing as one of seven alternative ways for an individual to satisfy the material participation test of section 469(h)(1) that an individual shall be treated as materially participating in an activity for a taxable year if he or she participates in the activity for more than 500 hours during such year.  Accordingly, we hold that regulation to be valid.

Application of Section 1.469-5T(a)(1),
Temporary Income Tax Regs.

Petitioners claim that petitioner should be treated as having materially participated in his rental activity at Crestwood for each of the years at issue under section 1.469-

---

[22]  Petitioners also contend that sec. 1.469-5T(a)(1), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988), is invalid because it is ambiguous in that it does not provide adequate guidelines for defining how to compute the number of hours devoted to a particular activity.  An interpretative regulation must be upheld if it "implement[s] the congressional mandate in some reasonable manner".  National Muffler Dealers Association, Inc. v. United States, 440 U.S. 472, 476-477 (1979) (quoting United States v. Cartwright, 411 U.S. 546, 550 (1973)).  Such a regulation cannot be declared invalid, unless it is "unreasonable and plainly inconsistent with the revenue statutes".  Commissioner v. South Texas Lumber Co., 333 U.S. 496, 501 (1948).  The lack of precision by a regulation in defining its own terms may not necessarily be a basis for holding that regulation invalid, provided that the regulation is construed in a manner so that it harmonizes with the plain language of the statute, its origin, and its purpose.

5T(a)(1), Temporary Income Tax Regs., supra, because he was involved in that activity for more than 500 hours during each of those years. Respondent disagrees with petitioners' contention.

Based on our examination of the entire record before us, we find that petitioners have failed to establish through any reasonable means as required by section 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988),[23] that, during each of the years at issue, petitioner's participation in his rental activity at Crestwood exceeded 500 hours. On that record, we have found as a fact that, during each of those years, petitioner spent a total of at least 75, but no more than 135, hours in attending to matters relating to the operations of Crestwood Association and in attending to matters relating exclu-

---

[23] Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988), sets forth the manner in which an individual may prove the degree of his or her participation in an activity. It provides that although a taxpayer is not required to maintain contemporaneous daily time reports, logs, or similar documents, the taxpayer must substantiate the level of his or her participation through reasonable means. Reasonable means include, but are not limited to, "the identification of services performed over a period of time and the approximate number of hours spent performing such services during such period, based on appointment books, calendars, or narrative summaries." Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., supra.

Our finding that petitioner spent during each year at issue a total of at least 75, but no more than 135, hours on matters relating to the operations of Crestwood Association and on matters relating exclusively to his two Crestwood condominium units is based on the actual amount of time spent by him on such matters as established by the record and our estimate of the time spent by him on such matters where the record does not establish the actual amount of time spent, but contains sufficient evidence from which we were able to estimate the amount of such time.

sively to his two Crestwood condominium units.  Accordingly, we find that petitioners have failed to establish that petitioner is to be treated as having materially participated during each of the years at issue in his rental activity at Crestwood under section 1.469-5T(a)(1), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988).

<u>Section 1.469-5T(a)(6), Temporary Income Tax Regs.</u>

Petitioners claim that petitioner should be treated as having materially participated in his rental activity at Crestwood for each of the years at issue under section 1.469-5T(a)(6), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988), because his rental activity at Crestwood was a personal service activity and he materially participated in that activity for the three taxable years preceding each of the taxable years at issue. Respondent disagrees with petitioners' contention.

Section 1.469-5T(d), Temporary Income Tax Regs., <u>supra</u>, defines the term "personal service activity" as follows:

> (d) <u>Personal service activity</u>.  An activity con-
> stitutes a personal service activity * * * if such
> activity involves the performance of personal services
> in--
>
> (A) The fields of health, law, engineering,
> architecture, accounting, actuarial science, performing
> arts, or consulting; or
>
> (B) Any other trade or business in which
> capital is not a material income-producing factor.

The regulations under section 469 do not provide a definition of what constitutes an activity in which capital is not a material

income-producing factor.  Nor has that phrase in the regulations under section 469 been construed by the courts.  However, courts have faced the question of whether capital is a material income-producing factor in other contexts.  See, e.g., Friedlander v. United States, 718 F.2d 294 (9th Cir. 1983); Gord v. Commissioner, 93 T.C. 103 (1989); Moore v. Commissioner, 71 T.C. 533 (1979).  In those other contexts, the courts have followed the general rule that capital is a material income-producing factor if a substantial portion of the gross income of the business is attributable to the employment of capital in the business, which is likely to be the case if the operation of the business re quires substantial inventories or substantial investments in plant, machinery, or other equipment.  See, e.g., Moore v. Com- missioner, supra at 538.  Capital is not a material income- producing factor if the gross income of the business consists principally of fees, commissions, or other compensation for personal services.  Id.

On the instant record, we find that petitioner's rental activity at Crestwood is not a personal service activity within the meaning of section 1.469-5T(d), Temporary Income Tax Regs., supra, even though it involved the furnishing of certain hotel- type services to patrons (e.g., on-site management, daily house- keeping service, and 24-hour switchboard service).  Petitioner's rental activity at Crestwood did not involve the performance of personal services in the fields that are specifically identified

in that regulation.  We further find on the record before us that that activity necessarily employed capital as a substantial, material income-producing factor.  In other words, a substantial portion of the gross income of petitioner's rental activity at Crestwood was attributable to his capital investment in his two condominium units, the furnishings in those units, and the common elements of Crestwood consisting of the land, buildings, and other physical facilities of Crestwood.  Consequently, we find that petitioners have failed to establish that petitioner is to be treated as having materially participated during each of the years at issue in his rental activity at Crestwood under section 1.469-5T(a)(6), Temporary Income Tax Regs., supra.[24]

Section 1.469-5T(a)(7), Temporary Income Tax Regs.

Petitioners claim that petitioner should be treated as having materially participated in his rental activity at Crestwood for each of the years at issue under section 1.469-5T(a)(7), Temporary Income Tax Regs., supra (facts and circumstances test) because, based on all of the facts and circumstances, he was involved in that activity on a regular, continuous, and substantial basis during each such year.  Respondent disagrees with that contention.

_____

[24]  Since petitioners have failed to satisfy the first prong of the test under sec. 1.469-5T(a)(6), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988), we need not, and do not, address whether petitioners satisfy the second prong of that test, i.e., whether petitioner materially participated in that activity for any three taxable years (whether or not consecutive) preceding each of the taxable years at issue.

In advancing their claim that petitioner materially participated in his rental activity at Crestwood under the facts and circumstances test, petitioners disregard the following limitations with respect to the applicability of that test that are set forth in section 1.469-5T(b)(2)(ii) and (iii), Temporary Income Tax Regs., supra:

> (ii) Certain management activities. An individual's services performed in the management of an activity shall not be taken into account in determining whether such individual is treated as materially participating in such activity for the taxable year under paragraph (a)(7) of this section unless, for such taxable year--
>
> (A) No person (other than such individual) who performs services in connection with the management of the activity receives compensation described in section 911(d)(2)(A) in consideration for such services; and
>
> (B) No individual performs services in connection with the management of the activity that exceed (by hours) the amount of such services performed by such individual.
>
> (iii) Participation less than 100 hours. If an individual participates in an activity for 100 hours or less during the taxable year, such individual shall not be treated as materially participating in such activity for the taxable year under paragraph (a)(7) of this section.

Respondent contends that the foregoing limitations preclude petitioner from being treated under the facts and circumstances test as having materially participated for each of the years at issue in his rental activity at Crestwood.

We have found as a fact that during each of the years at issue petitioner spent a total of at least 75, but no more than

135, hours in attending to matters relating to the operations of Crestwood Association and in attending to matters relating exclusively to his two Crestwood condominium units. If during either of the years at issue petitioner were involved in his rental activity at Crestwood for 100 hours or less, pursuant to section 1.469-5T(b)(2)(iii), Temporary Income Tax Regs., supra, petitioner would not be treated under the facts and circumstances test as having materially participated in that activity for either year.

Assuming arguendo that petitioner were involved in his rental activity at Crestwood for more than 100 hours during each of the years at issue, petitioner nonetheless could not be treated under the facts and circumstances test as having materially participated in that activity for either of those years because of the limitations set forth in section 1.469-5T(b)(2)(ii)(A) and (B), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988). During 1989 and 1990, petitioner was involved in his rental activity at Crestwood almost exclusively through the performance of management services in connection with the operations of Crestwood Association. During each of those years, individuals other than petitioner, including Mr. Dempsey, vice president, chief operating officer, and general manager of Crestwood Association, and Ms. Gahm, assistant general manager of Crestwood Association, participated in petitioner's rental activity at Crestwood by performing management services in connec-

tion with the operations of Crestwood Association.  Since Mr. Dempsey, Ms. Gahm, and others were compensated during each of the years at issue for the performance of management services in connection with petitioner's rental activity at Crestwood, pursuant to section 1.469-5T(b)(2)(ii)(A), Temporary Income Tax Regs., supra, the performance of management services by petitioner cannot be taken into account for the purpose of determining whether petitioner is to be treated under the facts and circumstances test as having materially participated in that activity for each of those years.

In addition, the performance of management services during each of the years at issue in connection with petitioner's rental activity at Crestwood by individuals other than petitioner exceeded, by hours, the performance of management services by petitioner in connection with that activity.[25]  Consequently,

_____

[25]  During each of the years at issue, petitioner spent a total of at least 75, but no more than 135, hours in performing management services in connection with the operations of Crestwood Association and in attending to matters relating exclusively to his two Crestwood condominium units.  Mr. Dempsey and Ms. Gahm each spent at least 40 hours a week in order to carry out their management responsibilities in those operations.  Moreover, there were at least four to six other management employees who spent an undisclosed amount of time in performing management services in the operations of Crestwood Association.  In comparing the time spent by petitioner and by Mr. Dempsey, Ms. Gahm, and other Crestwood management staff in providing management services in connection with the operations of Crestwood Association, we have assumed arguendo that all the work done by petitioner in his capacity as a board member and an officer of Crestwood Association was work done by him in connection with the rental of his

(continued...)

pursuant to section 1.469-5T(b)(2)(ii)(B), Temporary Income Tax Regs., supra, the performance of management services by petitioner cannot be taken into account for the purpose of determining whether petitioner is to be treated under the facts and circumstances test as having materially participated in that activity for each of those years.

On the record before us, we find that petitioners have failed to establish that petitioner is to be treated as having

---

[25](...continued)
two condominium units. Consistently, we also assumed arguendo that all the work done by Mr. Dempsey, Ms. Gahm, and others in connection with the management of the operations of Crestwood Association was done by them in connection with the rental of petitioner's condominium units. In this regard, we note that, as was true of the record relating to the time spent by petitioner in connection with the Crestwood Association operations, we have no way of determining from the record before us how much of the time spent during the years at issue by Mr. Dempsey, Ms. Gahm, and others in performing management services related solely to petitioner's rental of his two condominium units during those years. We also note that, given the responsibilities and functions performed by petitioner as a board member and an officer of Crestwood Association and by Mr. Dempsey, Ms. Gahm, and others in performing management services for the Crestwood Association operations, we believe it reasonable to assume on the record before us that the portion of the total time spent by petitioner in performing management services relating to the rental of his two condominium units would bear the same ratio to the total time he spent in all Crestwood Association operations as the portion of the total time spent by Mr. Dempsey, Ms. Gahm, and others relating to the management of the rental of petitioner's condominium units bears to the total time they spent on all Crestwood Association operations. Consequently, we believe that even if the record enabled us to make findings as to the amount and extent of time spent by petitioner and by Mr. Dempsey, Ms. Gahm, and others on the management of petitioner's two condominium units, petitioner's time so spent would not exceed their time so spent.

materially participated during each of the years at issue in his rental activity at Crestwood under section 1.469-5T(a)(7), Temporary Income Tax Regs., supra.

## Conclusion

Based on our review of the entire record before us, we find that petitioners have failed to show that petitioner materially participated during either of the years at issue in his rental activity at Crestwood within the meaning of section 469 and the regulations thereunder.  Accordingly, we further find that the loss at issue for each of those years is a passive activity loss within the meaning of section 469.

## Additions to Tax and Accuracy-Related Penalties

### Section 6651

Respondent determined that petitioners are liable for each of the years 1989 and 1990 for the addition to tax under section 6651(a)(1) because they failed to file timely their Federal income tax return for each such year.  Specifically, respondent contends that petitioners failed to file timely those returns because petitioners' respective applications for automatic extension for those years were invalid.

In the case of failure to file an income tax return on the date prescribed for filing, section 6651(a)(1) imposes an addition to tax equal to five percent of the amount required to be shown in the return, with an additional five percent to be added for each month or partial month during which such failure con-

tinues, not to exceed 25 percent in the aggregate. The addition to tax under section 6651(a)(1) does not apply if it is shown that the failure to file was due to reasonable cause and not due to willful neglect. In order to prove reasonable cause, the taxpayer must show that, despite the exercise of ordinary business care and prudence, he or she was nevertheless unable to file the return within the prescribed time. Crocker v. Commissioner, 92 T.C. 899, 913 (1989).

Section 6072(a) provides that individuals who file their returns on the basis of the calendar year shall file those returns on or before April 15 following the close of the calendar year. For purposes of section 6651(a)(1), the determination of the prescribed date for filing a return must be made by reference to any extension of the time for filing the return. Section 6081(a) provides that the Secretary may grant a reasonable extension of time for the filing of any return and that such an extension shall not exceed six months. Section 1.6081-4(a)(1), Income Tax Regs., provides that an individual who is required to file a Federal income tax return shall be allowed an automatic four-month extension of time after the date prescribed for filing of the return, provided that the requirements set forth in that regulation are satisfied.

A taxpayer's application for automatic extension is not valid if it does not comply with the requirements set forth in section 1.6081-4(a), Income Tax Regs. See Crocker v. Commis-

sioner, supra at 911. One of the requirements set forth in that section is that that application must show a proper estimate of the taxpayer's tax liability for the taxable year for which the taxpayer is seeking an extension. Sec. 1.6081-4(a)(4), Income Tax Regs. In addition, an application for automatic extension must be accompanied by a full remittance of the unpaid portion of that estimated tax liability. Id. A taxpayer's estimate of his or her tax liability is proper if, considering the information available at the time the application for automatic extension is filed, it is a bona fide and reasonable estimate. Crocker v. Commissioner, supra at 908. A taxpayer is obligated to make a reasonable attempt to gather information necessary to the proper estimation of his or her tax liability. Id. If in the taxpayer's application for automatic extension the taxpayer "estimated his tax liability to be zero, even though he had, at the time he submitted the request, ample evidence discrediting the estimate," that application would be invalid. Id.

For each of the years at issue, petitioners were required to file their return by April 15 following the close of each such year. Sec. 6072(a). Petitioners filed applications for automatic extension for the years 1989 and 1990 dated April 13, 1990, and April 12, 1991, respectively. Since petitioners filed an application for automatic extension for each of the years at issue, the determination of whether their returns for those years were timely filed will depend on whether those applications are

valid.  See Crocker v. Commissioner, supra at 911.

In their respective applications for automatic extension for 1989 and 1990, petitioners estimated their respective tax liabilities to be zero.  As filed, petitioners' 1989 and 1990 returns showed tax liabilities of $66,958 and $70,742, respectively, after taking account of the losses at issue.  Those returns reported that petitioners received salaries during 1989 and 1990 of $315,662 and $359,962, respectively.  Even assuming arguendo that petitioners were entitled for each year at issue to a deduction for the loss in question here, petitioners have failed to establish that they could have reasonably believed that the deduction for each such year for such loss, together with other expenses for which they were entitled to deductions, were of such a magnitude to cause their taxable income for each of those years to be reduced to zero.  It is also significant that for the years 1987 and 1988, the two years preceding the taxable years at issue, petitioners' Federal income tax returns reflected positive tax liabilities in the amounts of $16,405 and $62,341, respectively.

Petitioners argue that the respective estimates of their Federal income tax liabilities for 1989 and 1990 that were shown in their respective applications for automatic extension for those years were reasonable because they relied on the advice of their accountant for the preparation of those applications.  Petitioners' failure to estimate properly their taxes cannot be

excused merely because they may have relied on the advice of a tax professional.  Berlin v. Commissioner, 59 F.2d 996, 997 (2d Cir. 1932); see United States v. Boyle, 469 U.S. 241, 249-250 (1985).  Petitioners failed to call their accountant as a witness to explain what information petitioners may have provided or what advice he may have given them regarding the preparation of the application for automatic extension for each of the years at issue.  Accordingly, on the instant record, petitioners have failed to establish that any reliance by them on the advice of their accountant was reasonable or in good faith.

Petitioners further argue that petitioner is not a tax specialist and that he was not aware that their applications for automatic extension for 1989 and 1990 could be invalidated due to improper estimates of their respective tax liabilities for those years.  Petitioners' argument is baseless.  It is particularly significant that each of the applications for automatic extension for the years at issue carried a clear warning on its face that an unreasonable estimate of the taxpayer's tax liability would cause the extension to be declared "null and void."  Petitioners signed their application for automatic extension for 1989.  Accordingly, at the time they signed that application, petition-ers knew that an unreasonable estimate in that application of their tax liability for 1989 would cause the extension to be declared "null and void."  Although petitioners did not sign their application for automatic extension for 1990, having signed

their application for automatic extension for 1989, they knew, or should have known, that, as with their application for automatic extension for 1989, an unreasonable estimate in their application for automatic extension for 1990 of their tax liability for that year would cause the extension to be declared "null and void."

We also note that although petitioner was not a tax specialist, he was an attorney and a sophisticated businessman. Given his professional background, petitioner should have been aware of the importance of providing accurate information when applying for an extension of time to file petitioners' 1989 and 1990 returns.

Petitioners also argue that they were not able to estimate properly their respective tax liabilities for 1989 and 1990 because they were involved in several ventures and the records reflecting the income and loss from those ventures were lengthy and complicated. Petitioners have failed to show that they made any reasonable attempt to gather the necessary information or to compile the available information to arrive at a reasonable estimate of their respective income tax liabilities for the years at issue.

On the instant record, we find that petitioners have not established that they made bona fide and reasonable estimates of their tax liabilities for 1989 and 1990. We further find that their applications for automatic extension for those years were invalid. Accordingly, petitioners were required to file their

1989 and 1990 returns by April 15, 1990, and April 15, 1991, respectively.[26]  See sec. 6072(a); Crocker v. Commissioner, 92 T.C. at 911.  Petitioners filed Federal income tax returns for 1989 and 1990 dated October 15, 1990, and October 14, 1991, respectively.  Thus, we hold that they failed to file timely their return for each of the years at issue.[27]

Although petitioners' argument is not entirely clear, they appear to contend that, assuming arguendo that their application for automatic extension for each of the years at issue were to be declared invalid, they nonetheless should not be liable for each such year for the addition to tax for failure to file timely their return.  Specifically, petitioners appear to contend that their failure to file timely was due to reasonable cause, and not due to willful neglect, because of the unavailability and com- plexity of their financial records.  Unavailability of records does not necessarily establish reasonable cause for failure to file timely.  See Electric & Neon, Inc. v. Commissioner, 56 T.C.

---

[26]  Petitioners filed an application for an additional extension of time to file their 1990 return dated Aug. 9, 1991.  Since we have found petitioners' application for automatic extension for that year to be invalid, the subsequently filed application for an additional extension of time to file is also invalid.  See Clayton v. Commissioner, 102 T.C. 632, 651 (1994).

[27]  Petitioners did not file an application for an additional extension of time to file their 1989 return.  Assuming arguendo that petitioners' application for automatic extension for 1989 had been valid, their 1989 return would nonetheless not have been filed timely, since they would have been required to, but did not, file that return by Aug. 15, 1990.  See sec. 1.6081-4(a), Income Tax Regs.

1324, 1343 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974).  A taxpayer is required to file timely based on the best information available and to file thereafter an amended return if necessary.  Estate of Vriniotis v. Commissioner, 79 T.C. 298, 311 (1982).  Petitioners did not show what, if any, efforts they made to obtain information concerning their income and expenses, nor did they compile the available information to prepare a reasonably accurate tax return.  Under these circumstances, we conclude that petitioners have not demonstrated that their failure to file timely their 1989 and 1990 returns was due to reasonable cause and not due to willful neglect.  We therefore sustain respondent's determination imposing the addition to tax on petitioners for each of the years 1989 and 1990 for their failure to file timely returns for each of those years.

Section 6662

Respondent determined that petitioners are liable for each of the years 1989 and 1990 for the accuracy-related penalty under section 6662(a) because their underpayment of tax for each of those years was due to negligence or disregard of rules or regulations.  For purposes of section 6662(a), the term "negligence" includes any failure to make a reasonable attempt to comply with the Code, failure to exercise due care, or failure to do what a reasonable person would do under the circumstances.  Sec. 6662(c); Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), affg. T.C. Memo. 1991-179; Antonides v. Commissioner, 91

T.C. 686, 699 (1988), affd. 893 F.2d 656 (4th Cir. 1990).  The
term "disregard" includes any careless, reckless, or intentional
disregard of the Code and the temporary or final regulations is-
sued thereunder.  Sec. 6662(c); sec. 1.6662-3(b)(2), Income Tax
Regs.

The accuracy-related penalty under 6662(a) does not apply to
any portion of an underpayment if it is shown that there was a
reasonable cause for such portion and that the taxpayer acted in
good faith with respect to such portion.  Sec. 6664(c)(1).  The
determination of whether the taxpayer acted with reasonable cause
and in good faith depends upon the pertinent facts and circum-
stances.  Sec. 1.6664-4(b)(1), Income Tax Regs.  Factors taken
into account include the taxpayer's efforts to assess his or her
proper tax liability and the knowledge and experience of the
taxpayer.  Id.  Reliance on the advice of a professional, such
as an accountant, does not necessarily demonstrate reasonable
cause and good faith unless, under all the circumstances, such
reliance was reasonable and the taxpayer acted in good faith.
Id.

Petitioners' underpayment for each of the years at issue
results partially from their having used the reported losses from
petitioner's rental activity at Crestwood to offset nonpassive
income.[28]  Petitioners claim that petitioner is not a tax spe

---

[28]  Petitioners challenge respondent's determinations imposing
(continued...)

cialist and that he relied on the advice of their accountant in offsetting those losses against nonpassive income. A taxpayer's duty to file an accurate return cannot be avoided by placing responsibility on an agent. Pritchett v. Commissioner, 63 T.C. 149, 174 (1974). Each taxpayer has a duty to comply with the Federal income tax laws and to become familiar with those laws. A taxpayer may avoid the imposition of the accuracy-related penalty by demonstrating that he or she relied on the advice of a tax professional and that such reliance was reasonable and in good faith. Sec. 1.6664-4(b)(1), Income Tax Regs. In order for reliance on the advice of a tax professional to be reasonable, the taxpayer must establish that correct information was provided to the professional and that the item incorrectly reported in the return was the result of the professional's error. See Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 173 (1978). The taxpayer must also prove that a reasonable person would have relied upon the advice provided. See Illes v. Commissioner, 982 F.2d 163, 166 (6th Cir. 1992), affg. per curiam T.C. Memo. 1991-449. Petitioners failed to call their accountant as a witness to explain what information petitioners may have provided him or what advice he may have given them regarding the use of losses

---

28(...continued)
the accuracy-related penalties for 1989 and 1990 only to the extent that they relate to their having used the reported losses from petitioner's rental activity at Crestwood to offset non-passive income.

from petitioner's rental activity at Crestwood to offset nonpassive income. Moreover, although petitioner is not a tax specialist, he is highly educated and is a sophisticated businessman. He had invested in several tax shelters in the past that were challenged by the Service. In fact, petitioner had specific knowledge of the limitations imposed on the deductibility of losses sustained from his rental activity at Crestwood because he was informed of those limitations during the board meeting held in January 1988. Based on our review of the instant record, we find that petitioners have failed to establish that any reliance by them on the advice of their accountant was reasonable or in good faith.

Petitioners further claim that they are not liable for the years at issue for the accuracy-related penalties under section 6662(a) because the facts and circumstances relating to petitioner's involvement in his rental activity at Crestwood establish that he materially participated in that activity. On the instant record, we find that application of section 469 and the pertinent regulatory provisions to the facts surrounding petitioner's involvement in his rental activity at Crestwood would not have enabled petitioners to conclude reasonably that that involvement rose to the level of material participation during each of the years at issue. We also note that we have held section 1.469-5T(a)(1), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988), which petitioners challenge, to be valid. On the record

herein, we find that petitioners had no reasonable basis for having used the losses relating to petitioner's rental activity at Crestwood that they reported in their Federal income tax returns for 1989 and 1990 to offset their reported income from other sources for those years.  See, e.g., <u>Cramer v. Commissioner</u>, 101 T.C. 225, 254 (1993), affd. 64 F.3d 1406 (9th Cir. 1995); <u>Grant v. Commissioner</u>, 84 T.C. 809, 827 (1985), affd. without published opinion 800 F.2d 260 (4th Cir. 1986).

On the instant record, we find that petitioners have not established that they acted with reasonable cause and in good faith when they used the reported losses from petitioner's rental activity at Crestwood to offset nonpassive income.  We therefore sustain respondent's determination imposing the accuracy-related penalty on petitioners for each of the years 1989 and 1990.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered</u>

<u>under Rule 155</u>.